20 F.3d 1418
 38 ERC 1393, 24 Envtl. L. Rep. 20,848
 SOUTHERN OHIO COAL COMPANY, Plaintiff-Appellee,
v.
OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT,
DEPARTMENT OF the INTERIOR; United States Environmental
Protection Agency; Richard Seibel, Field Office Director,
OSM; W. Hord Tipton, Acting Director, OSM; Carol Browner,
EPA Administrator; and Valdas V. Adamkus, EPA
Administrator, Region V, Defendants-Appellants.
 No. 93-3878.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 28, 1994.
Decided April 8, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied May 31, 1994.
 
 Anthony J. Celebrezze, Jr., Charles H. Cooper, Jr., Christopher C. Russell, Alvin James McKenna, Donald Michael Miller (argued and briefed), Mark S. Stemm, Janet J. Henry, Porter, Wright, Morris & Arthur, Columbus, OH, for Southern Ohio Coal Co.
 James E. Rattan, Asst. U.S. Atty., Office of the U.S. Atty., Columbus, OH, Joshua M. Levin, Myles E. Flint, Environmental Defense Section, Washington, DC, for Department of Interior, Office of Surface Min., Reclamation and Enforcement, Richard Seibel, W. Hord Tipton, Carol Browner, Valdas V. Adamkus.
 James E. Rattan, Asst. U.S. Atty., Office of the U.S. Atty., Columbus, OH, Joshua M. Levin, Myles E. Flint, Environmental Defense Section, Washington, DC, Anne S. Almy, Edward A. Boling (argued and briefed), U.S. Dept. of Justice, Washington, DC, for U.S. E.P.A.
 Thomas M. Myers (briefed), Shadyside, OH, for District Six and Local Unions 1857 and 1886 of United Mine Workers of America, amicus curiae.
 Before: KENNEDY and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.
 KENNEDY, Circuit Judge.
 
 
 1
 In this appeal, we address two similar issues involving the jurisdiction of the District Court over the United States Environmental Protection Agency ("USEPA") and the Office of Surface Mining, Reclamation and Enforcement of the Department of the Interior ("OSM").[1] Both agencies took or threatened to take enforcement actions related to the flooding of an Ohio coal mine that were at odds with decisions of their respective state counterpart agencies, the Ohio Environmental Protection Agency ("OEPA") and the Ohio Division of Reclamation ("ODR"). The court enjoined the federal agencies from acting "to effect the cessation of pumping at [the mine] unless their respective parallel approved state agencies fail to act vigorously, expeditiously, and in accordance with law." Because we find that the court lacked jurisdiction to enjoin USEPA and OSM in this manner, we reverse the judgment of the District Court.I.
 
 A. Factual Background[2]
 
 2
 Plaintiff Southern Ohio Coal Company ("SOCCO") operates one of the country's largest underground coal mines in Meigs County, Ohio. On July 11, 1993, SOCCO's Meigs Mine Number 31 ("Meigs 31") was inundated with water from an adjacent partially abandoned mine known as Raccoon Mine Number 3 ("Raccoon 3"). In 1989, what was formerly Meigs Mine Number 1 and a portion of Raccoon 3 were merged into what is now known as Meigs 31. When Meigs 31 was formed, part of Raccoon 3 was abandoned. A bulkhead was installed between the abandoned portion of Raccoon 3 and Meigs 31 to prevent naturally occurring water in Raccoon 3 from flooding into Meigs 31 and to permit pumping of naturally occurring water from Meigs 31 into Raccoon 3. At the time of the preliminary injunction, the cause of the flood had not been conclusively established and may or may not have been the failure of the bulkhead.
 
 
 3
 Under normal operations, the naturally occurring minewater, which is highly acidic, is neutralized with an alkaline agent before it is discharged into receiving waters. When wastewater is discharged into the waters of the United States, it must meet effluent limitations and other conditions established under the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. Sec. 1251 et seq., commonly referred to as the Clean Water Act (the "CWA"). The CWA prohibits "the discharge of any pollutant by any person," except as permitted by the CWA. Id. Sec. 1311(a). The primary regulatory mechanism employed to control discharges is a permitting system known as the National Pollutant and Discharge Elimination System ("NPDES"). A NPDES permit is required before a person may discharge pollutants into the navigable waters of the United States. The discharge must be in accordance with the permit's conditions, which include effluent limitations. Under 33 U.S.C. Sec. 1342(b), a state may administer the NPDES permit program within its borders if USEPA determines that the state program meets federal criteria set forth in the CWA and implementing regulations. USEPA approved and authorized the State of Ohio's NPDES program on March 11, 1974.
 
 
 4
 Meigs 31 naturally takes in and has the capacity to treat two to two and one-half million gallons of water per day. After the flood, an estimated one billion gallons of water filled Meigs 31. The floodwater contained levels of iron over 100 times the legal limit as well as excessive levels of zinc, manganese and copper. Ordinarily, the water would have to be treated before it could be discharged. The mine's existing treatment facilities, however, could not handle such a vast quantity of water within an acceptable time frame. SOCCO estimated that the floodwater would have to be evacuated within a period of two to four months because the water threatened the structural integrity of the mine; otherwise, Meigs 31 could no longer be mined safely. SOCCO operates only two mines, Meigs 31 and Meigs Mine Number 2 ("Meigs 2"). The viability of Meigs 2 depends to a great extent upon the continued operation of Meigs 31.
 
 
 5
 After reviewing and rejecting various proposals for the evacuation of the floodwater, SOCCO decided upon a plan that called for drilling new boreholes and installing new pumps and pumping untreated and minimally treated water into surrounding creeks and streams, which are tributaries of the Ohio River. SOCCO acknowledged that the discharge would kill all aquatic life, reduce pH levels and increase sedimentation of iron, zinc, manganese and copper in the receiving waters. The proposed evacuation was not predicted to have a permanent effect on the environment; according to SOCCO's experts, the aquatic life that would be killed by the discharge would renew itself within two years. SOCCO also concluded that because the receiving waters were not used for human consumption prior to the proposed evacuation, the plan would not adversely affect human life.
 
 
 6
 SOCCO needed OEPA's approval to proceed with its plan, as it included discharges from unpermitted sources that exceeded the effluent limitations of SOCCO's NPDES permit. SOCCO's NPDES permit provides for emergency bypasses of permit conditions under certain situations. OEPA found that the situation at Meigs 31 warranted the requested bypass. On July 26, 1993, the Director of OEPA issued a written order, the "Director's Final Findings and Orders" ("DFFO"), authorizing the evacuation plan.
 
 
 7
 Before SOCCO could begin pumping, the ODR stepped in and prohibited SOCCO from commencing the plan. The ODR is the Ohio agency responsible for enforcing mining laws and regulations in the state and is the primary enforcer of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. Sec. 1201 et seq. The SMCRA was designed to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations...." Id. Sec. 1202(a). OSM, which was created by the SMCRA, has the responsibility of administering, approving, and overseeing the implementation of the SMCRA's programs. Id. Sec. 1211. Any state that wishes to assume exclusive jurisdiction over implementing and enforcing the SMCRA, may do so subject to federal approval and oversight. Id. Sec. 1253(a). Ohio's regulatory program under the SMCRA was approved by the Secretary of the Interior on August 16, 1982.
 
 
 8
 ODR found that significant, imminent environmental harm or danger to public health or safety would result if SOCCO's discharge plan was implemented. On July 27, 1993, the Ohio Reclamation Board of Review (the "Board") granted temporary relief from ODR's order upon its finding that the plan posed no threat of imminent harm to the environment or the public. SOCCO again prepared to begin pumping. After its own inspection, OSM[3] entered the picture and issued a cessation order against SOCCO pursuant to 30 U.S.C. Sec. 1271(a)(2). In contrast to the Board's conclusions, OSM found that a threat of significant imminent harm existed and that pumping should not commence.
 
 B. Procedural Background
 
 9
 On July 29, 1993, SOCCO urgently sought a temporary restraining order ("TRO") against OSM:
 
 
 10
 Immediate relief is requested because, while the ravaging effects of the mine flood continue, Defendants have blatantly and irrationally acted outside their jurisdictional authority by, without cause, ordering immediate cessation of water removal. This unlawful action comes at a time when each passing hour of lost pumping time could mean the difference between saving and losing the mine, and ultimately, the entire complex. Shutdown of this Mine in SOCCO's two-mine complex seriously jeopardizes the economic viability of the entire complex. At stake are the jobs of 820 employees, over 4,900 mine-support and spin-off jobs and over One Hundred Million Dollars ($100,000,000.00) contributed annually by SOCCO and its employees to the local economies of the area.
 
 
 11
 SOCCO alleged that OSM was acting without authority because the state had primary enforcement authority under the SMCRA. The court granted the TRO the next day, finding that since OSM had approved the state program, including the procedure of Board review of ODR decisions, OSM was required to defer to the state's actions so long as the actions were in accordance with approved procedures. The order declared OSM's cessation order a nullity and restrained OSM from acting in any manner to stop or interfere with implementation of the water-removal plan as long as the state program was being administered in accordance with law.
 
 
 12
 SOCCO began pumping pursuant to the plan on July 30, 1993. On August 3, USEPA informed SOCCO that unless it voluntarily ceased pumping so that USEPA could investigate alleged violations of the CWA, USEPA was prepared to issue an order under 33 U.S.C. Sec. 1319 to prevent further pumping. On August 4, SOCCO made a motion to join USEPA and two of the agency's officials as defendants in this matter. SOCCO sought and obtained a TRO restraining USEPA from:
 
 
 13
 (1) issuing an administrative order against Southern Ohio Coal Company's water removal plan for Meigs Mine No. 31; and
 
 
 14
 (2) taking any other action aimed to stop, interfere with or delay Southern Ohio Coal Company's implementation of its water removal plan for Meigs Mine No. 31.
 
 
 15
 SOCCO also filed a motion for preliminary and permanent injunctive relief against OSM and USEPA.
 
 
 16
 On August 6, 1993, USEPA moved to vacate the TRO on the grounds that (1) the District Court lacks jurisdiction under the CWA to review administrative orders and thus plainly lacks jurisdiction to enjoin the issuance of orders or the taking of other actions associated with enforcement of the CWA, and (2) SOCCO failed to demonstrate a likelihood of success or a likelihood of irreparable harm in absence of the TRO. On August 19, the court denied USEPA's motion to vacate and granted SOCCO's motion for preliminary injunctive relief. Southern Ohio Coal Co. v. Office of Surface Mining Reclamation & Enforcement, et al., 831 F.Supp. 1324 (S.D.Ohio 1993) ("SOCCO II ").[4] Defendants timely appealed.
 
 II. OSM
 A. Exhaustion Requirement
 
 17
 The District Court addressed the issue of whether it had jurisdiction to issue the temporary restraining order and preliminary injunction against OSM in its order granting the first TRO against OSM. Southern Ohio Coal Co. v. Office of Surface Mining Reclamation & Enforcement, et al., 831 F.Supp. 1322, 1324 (S.D.Ohio 1993) ("SOCCO I "). It found that because "there is a substantial likelihood that [SOCCO] will prevail on the merits and that the relief will not adversely affect the public health or safety or cause significant imminent environmental harm to land, air, or water resources" it had jurisdiction under 30 U.S.C. Sec. 1276. Section 1276 provides for judicial review of the Secretary's decisions by United States District Courts. The court did not believe that the exhaustion of administrative remedies was required before jurisdiction under this section becomes available. We disagree as the District Court's interpretation of the statute is directly contrary to this Court's decision in Shawnee Coal Co. v. Andrus, 661 F.2d 1083 (6th Cir.1981).
 
 
 18
 In Shawnee Coal, the lower court enjoined the Secretary of the Interior from enforcing cessation orders against the Shawnee Coal Company, which had been issued pursuant to 30 U.S.C. Secs. 1271(a)(3) and 1272(e)(4), basing its jurisdiction on section 1276. We reversed, holding that the lower court lacked jurisdiction because the coal company had failed to exhaust the administrative remedies provided in 30 U.S.C. Sec. 1275 before seeking judicial review under section 1276. Id. at 1092. The Shawnee Coal case is controlling here.
 
 
 19
 Quoting from the Supreme Court in Hodel v. Virginia Surface Mining and Reclamation Association, 452 U.S. 264, 298-99, 101 S.Ct. 2352, 2371-72, 69 L.Ed.2d 1 (1981), we set forth the relationship between administrative action and judicial review under the SMCRA:
 
 
 20
 A mine operator aggrieved by an immediate cessation order issued under Sec. 521(a)(2)[, 30 U.S.C. Sec. 1271(a)(2),] or by a cessation order issued after a notice of violation and expiration of an abatement period under Sec. 521(a)(3)[, 30 U.S.C. Sec. 1271(a)(3),] may immediately request temporary relief from the Secretary, and the Secretary must respond to the request within 5 days of its receipt. Sec. 525(c), 30 U.S.C. Sec. 12. Section 526(c) of the Act, 30 U.S.C. Sec. 1276(c), authorizes judicial review of a decision by the Secretary denying temporary relief. In addition, cessation orders are subject to informal administrative review under Sec. 521(a)(5), [30 U.S.C. Sec. 1271(a)(5),] and formal administrative review, including an adjudicatory hearing, under Sec. 525(b), 30 U.S.C. Sec. 1275(b). The Secretary's decision in the formal review proceeding is subject to judicial review pursuant to Sec. 526(a)(2), 30 U.S.C. Sec. 1276(a).
 
 
 21
 Shawnee Coal, 661 F.2d at 1091.
 
 
 22
 Further,
 
 
 23
 [section] 526(c) authorizes judicial review when the Secretary has issued an order or decision denying temporary relief from a cessation order issued under Sec. 521(a)(2), (3) or (4), 30 U.S.C. Sec. 1271(a)(2), (3), or (4). It is not, as Shawnee contends, an independent jurisdictional grant permitting intervention by a federal court prior to a party's resort to the administrative process. Rather, the statute's authorization of judicial review is inextricably intertwined with the administrative review procedures of Sec. 525(c), 30 U.S.C. Sec. 1275(c).
 
 
 24
 ....
 
 
 25
 The ready availability of adequate administrative relief also dictates that an aggrieved party exhaust its administrative remedies before procuring judicial review. Seepe v. Department of the Navy, 518 F.2d 760, 762 (6th Cir.1975).
 
 
 26
 Id. at 1091-92 (emphasis added). SOCCO did not avail itself of the administrative relief provided by section 1275(c). We must therefore find that there is no basis for jurisdiction under section 1276(c).
 
 
 27
 SOCCO attempts to distinguish Shawnee Coal on the grounds that the case was decided before a permanent regulatory program had been approved in the State of Ohio. Under the SMCRA, Congress delineated a two-tiered regulatory program consisting of an interim phase and a permanent phase. Because Shawnee Coal was decided during the interim phase, SOCCO argues that it has no application here where Ohio has entered the permanent phase. There is, however, no indication in the statute that sections 1275 and 1276 apply only during the interim phase. Moreover, as Congress most assuredly contemplated eventual permanent programs in all states, whether state or federally controlled, we hold that these provisions apply to permanent programs.
 
 B. Exceptions To The Exhaustion Requirement
 
 28
 SOCCO next contends that OSM had no authority to issue a cessation order under section 1271(a)(2) and that the court therefore had jurisdiction to enjoin such unlawful agency action under Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). In Leedom, the Supreme Court established the principle that the exhaustion requirement may be waived where an agency acts "in excess of its delegated powers and contrary to a specific [statutory] prohibition." Leedom, 358 U.S. at 188, 79 S.Ct. at 184. Before a federal court may step in, the aggrieved party must also establish that the " 'absence of jurisdiction of the federal courts' " would mean " 'a sacrifice or obliteration of a right which Congress' had created." Id. at 190, 79 S.Ct. at 185 (quoting Switchmen's Union of North America v. National Mediation Bd., 320 U.S. 297, 300, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943)).
 
 
 29
 We have observed that the Leedom exception to the exhaustion of administrative remedies doctrine "is a narrow anomaly reserved for extreme situations. Thus, even when the issue of agency jurisdiction is raised, the exhaustion doctrine generally requires that an agency be accorded an opportunity to determine initially whether it has jurisdiction." Shawnee Coal, 661 F.2d at 1093 (citation omitted). Before the Leedom exception can be invoked, an agency's action must be manifestly beyond the realm of its delegated authority. Because we conclude that OSM was not only acting within the realm of its authority, but was required to act as it did, we do not reach the other criteria we have used to determine whether the exhaustion requirement should be waived.[5]
 
 
 30
 The District Court held that OSM had no authority to act under section 1271(a)(2), where "the approved state agency has ... already assumed jurisdiction ..., so long as that state agency is acting appropriately." SOCCO I, 831 F.Supp. at 1323.[6] The court found that this "state primacy" requirement, which allegedly arises from section 1201(f),[7] exists in states where there is a federally-approved state program in place.
 
 
 31
 There is nothing in the SMCRA placing such a limitation upon OSM's authority. Indeed, under section 1271(a)(2), OSM is obligated to issue a cessation order, and take further action if necessary, where a mine poses "an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources...." States that desire exclusive jurisdiction over the regulation of coal mining and reclamation operations may acquire it as provided in section 1253(a), subject however to sections 1271 and 1273. The fact that a mine is located in a primacy state is irrelevant to OSM's duties under section 1271. As OSM's actions were not only within its delegated statutory authority, but were mandated by section 1271(a)(2), the standards of the Leedom exception have not been met.
 
 
 32
 We have recognized several other exceptions to the exhaustion of administrative remedies doctrine:
 
 
 33
 Where pursuit of administrative remedies does not serve the purposes behind the exhaustion doctrine, the courts have allowed a number of exceptions. Thus, exhaustion is not required if administrative remedies are inadequate or not efficacious; where pursuit of administrative remedies would be a futile gesture; where irreparable injury will result unless immediate judicial review is permitted; or where the administrative proceeding would be void.
 
 
 34
 Shawnee Coal, 661 F.2d at 1093 (citations omitted).
 
 
 35
 SOCCO alleges that the pursuit of administrative remedies would have been inadequate, futile and would have resulted in irreparable injury, and that, therefore, the exhaustion requirement was properly waived. First, SOCCO asserts that the promise of expedited relief under section 1275(c) has "proven wholly illusory" because "significant delays in adjudicating temporary relief applications on the federal level have proven to be the rule rather than the exception...." SOCCO cites four Interior Board of Land Appeals ("IBLA") decisions[8] as authority for its allegations. Defendants assert that these decisions do not support SOCCO's position because one decision did not involve the five-day decision requirement and the complainants waived their right to a five-day decision in the other three decisions. SOCCO next summarily alleges that had it engaged the administrative appeal process the delay involved would have resulted in irreparable harm to the mine. It was projected that the emptying of the mine would require from thirty to sixty days of pumping. SOCCO has pointed to no evidence that an additional five days of delay would have meant the ruin of the mine. We find that SOCCO has failed to make a satisfactory showing of inadequacy, futility or irreparable injury. Cf. Davis v. Keohane, 835 F.2d 1147, 1148-49 (6th Cir.1987).
 
 
 36
 SOCCO also asserts that the District Court had jurisdiction over the dispute because of the constitutional issues it raised. We have stated that exhaustion of administrative remedies may not be required in cases of constitutional challenges to an agency's procedures. Southern Ohio Coal Co. v. Donovan, 774 F.2d 693, 702 (6th Cir.1985), amended by, 781 F.2d 57 (6th Cir.1986). In the Fifth Circuit, "an 'assertion of [a] constitutional right ... not transparently frivolous ... [gives] the District Court jurisdiction' to hear an attack on an interlocutory agency order." Coca-Cola Co. v. Federal Trade Comm'n, 475 F.2d 299, 303 (5th Cir.) (quoting Fay v. Douds, 172 F.2d 720 (2d Cir.1949)), cert. denied, 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973).
 
 
 37
 In the present case, SOCCO has not alleged a colorable constitutional claim. In its complaint, it asserted that OSM's actions "deprived [SOCCO] of its property without due process of law in violation of the Fifth Amendment of the United States Constitution." First, the Supreme Court has already upheld the Act's administrative review procedures in a facial due process challenge. Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 298-303, 101 S.Ct. 2352, 2371-74, 69 L.Ed.2d 1 (1981). As in the present case, Hodel involved an immediate cessation order issued under section 1271(a)(2). The requirement that the Secretary respond to a request for temporary relief from the order within five days, 30 U.S.C. Sec. 1275(c), and the provision for subsequent judicial review, Id. Sec. 1276(c), satisfied the Court that "the Act's immediate cessation order provisions comport with the requirements of due process." Id. at 303, 101 S.Ct. at 2374. Second, if SOCCO made a claim under the Takings Clause of the Fifth Amendment and if the immediate cessation order "gives rise to a taking, compensation is available to [SOCCO] under the Tucker Act, 28 U.S.C. Sec. 1491(a)(1), and the requirements of the Fifth Amendment are satisfied." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 4-5, 110 S.Ct. 914, 918, 108 L.Ed.2d 1 (1990).
 
 
 38
 SOCCO lastly argues that the court had jurisdiction under Darby v. Cisneros, --- U.S. ----, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), which held that where neither the relevant statute nor regulations require exhaustion of administrative remedies prior to seeking judicial review, federal courts cannot impose an exhaustion requirement as a prerequisite to review under the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 701 et seq. Darby is inapposite to this case because the SMCRA unambiguously requires resort to the prescribed administrative review process before seeking judicial review. The Court noted that in cases such as this that are not governed by the APA,
 
 
 39
 appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme.
 
 
 40
 Darby at ----, 113 S.Ct. at 2548 (quoting McCarthy v. Madigan, --- U.S. ----, ----, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992)).
 
 
 41
 Given that SOCCO has failed to exhaust its administrative remedies and that no exception to the exhaustion doctrine applies, we hold that the District Court erred in exercising jurisdiction over OSM under section 1276(c). We further hold that the court did not otherwise have jurisdiction to enjoin enforcement of the OSM cessation order.
 
 III. USEPA
 
 42
 It is important to bear in mind what issue is before this Court respecting the District Court's act of enjoining USEPA. We must answer whether the District Court had jurisdiction to enjoin USEPA from issuing an administrative order or taking any other action towards stopping the pumping at Meigs 31. The issue is not whether USEPA has "override" authority over OEPA's decision to grant SOCCO a bypass pursuant to the bypass provisions in SOCCO's NPDES permit. Neither is the propriety of the bypass decision before us. SOCCO remains free to raise the OEPA-approved bypass as an affirmative defense to any future enforcement action USEPA may bring. The issue before us centers on the power of a district court to review pre-enforcement action of USEPA.
 
 
 43
 Both the Fourth and Seventh Circuits have held that district courts lack jurisdiction to review compliance orders prior to the commencement of enforcement proceedings. Southern Pines Assocs. v. United States, 912 F.2d 713, 715-16 (4th Cir.1990); Hoffman Group Inc. v. EPA, 902 F.2d 567, 569 (7th Cir.1990). USEPA must either issue a compliance order or institute a civil action upon notice of a violation.[9] 33 U.S.C. Sec. 1319(a)(1), (3). In both Southern Pines and Hoffman Group, the courts concluded that Congress intended to preclude judicial review of compliance orders prior to the initiation of a civil action. This conclusion was based on their interpretation of the legislative history and the structure of the CWA.
 
 
 44
 The enforcement provisions of the CWA were modeled after the enforcement provisions of the Clean Air Act ("CAA"), 42 U.S.C. Sec. 7401 et seq. Southern Pines, 912 F.2d at 716 (citing S.Rep. No. 92-414, 92d Cong., 1st Sess. 63 (1971), reprinted in, 1972 U.S.Code Cong. & Admin.News pp. 3668, 3730). A review of the caselaw under the CAA reveals the uniform holding that judicial review of pre-enforcement orders, similar to those issued under the CWA, is not available. Id. (citing Union Elec. Co. v. EPA, 593 F.2d 299, 304 (8th Cir.), cert. denied, 444 U.S. 839, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979); Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885 (8th Cir.1977)). The same is true of pre-enforcement action under CERCLA, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Sec. 9601 et seq. Id. (citing Wagner Seed Co. v. Daggett, 800 F.2d 310, 315 (2d Cir.1986); Wheaton Indus. v. EPA, 781 F.2d 354, 356-57 (3d Cir.1986); United States v. Outboard Marine Corp., 789 F.2d 497, 505-06 (7th Cir.), cert. denied, 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986); Barnes v. United States District Court, 800 F.2d 822 (9th Cir.1986); J.V. Peters & Co. v. EPA, 767 F.2d 263, 264-65 (6th Cir.1985)).[10] After reviewing these statutes, the Fourth Circuit concluded: "The structure of these environmental statutes indicates that Congress intended to allow EPA to act to address environmental problems quickly and without becoming immediately entangled in litigation." Southern Pines, 912 F.2d at 716.
 
 
 45
 In contrast to the preclusion of review of compliance orders, the CWA explicitly provides for judicial review of the assessment of administrative penalties by USEPA. 33 U.S.C. Sec. 1319(g)(8). The Seventh Circuit believed that this express provision for judicial review, in combination with the absence of a parallel provision for review of compliance orders, was further support for its holding.
 
 
 46
 In drafting the Clean Water Act, Congress chose to make assessed administrative penalties subject to review while at the same time it chose not to make a compliance order judicially reviewable unless the EPA decides to bring a civil suit to enforce it.... Having provided a detailed mechanism for judicial consideration of a compliance order via an enforcement proceeding, Congress has impliedly precluded judicial review of a compliance order except in an enforcement proceeding.
 
 
 47
 Hoffman Group, 902 F.2d at 569.
 
 
 48
 Congress provided one forum in which to address all issues, including constitutional challenges, raised by the issuance of a compliance order: an enforcement proceeding. "And, since the enforcement proceeding is the only forum for enjoining violations of the Act, [an alleged violator] cannot be compelled to comply with the Compliance Order without an opportunity to challenge the Order's validity in court." Id. The potential liability of an alleged violator is not affected by the holding that no pre-enforcement judicial review of compliance orders is available. USEPA may bring an enforcement action without first issuing a compliance order. In an enforcement action, a court may issue an injunction or impose civil penalties of up to $25,000 per day for each violation of the Act, a permit or a compliance order. 33 U.S.C. Secs. 1319(b), 1319(d). A violator is subject to the same injunctive orders and penalties whether or not USEPA issues a compliance order.
 
 
 49
 Today we join the Fourth and Seventh Circuits in holding that district courts are without jurisdiction to review pre-enforcement compliance orders issued under the CWA. This holding applies not only to orders issued once a violation is discovered, but also to the investigatory work necessary to determine whether a violation exists. Here, therefore, the District Court lacked jurisdiction to enjoin USEPA from investigating the situation at Meigs 31. As the court itself acknowledged, "[u]ndoubtedly, the CWA vests in USEPA the authority to perform an investigation." SOCCO II, 831 F.Supp. at 1335. The court was likewise without jurisdiction to enjoin the issuance of an order given that it is without jurisdiction to review a compliance order.
 
 
 50
 SOCCO argues that they are not challenging pre-enforcement action, but instead are challenging the authority of USEPA to act at all under the circumstances of this case. This argument was made and rejected in Southern Pines and in a recent Seventh Circuit decision in the Hoffman Group line, Rueth v. EPA, 13 F.3d 227 (7th Cir.1993). Both courts were unpersuaded, as are we, that a jurisdictional challenge to the agency's issuance of an order is distinguishable from challenges to the order itself, which, as we have just held, can only be had in an enforcement proceeding. Both challenges interfere with USEPA's ability to quickly respond to environmental problems and both may be dealt with in an enforcement action. The Rueth court acknowledged that "it is not inconceivable that the EPA ... might completely overextend [its] authority. In such a case, [the court would] not hesitate to intervene in pre-enforcement activity, but this is not the case...." Rueth, 13 F.3d at 231. The District Court believed that the instant actions of USEPA presented such a case. We disagree.
 
 
 51
 First, in light of our holding that the CWA clearly precluded judicial review of pre-enforcement action, the District Court's reliance upon Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) and Darby v. Cisneros, --- U.S. at ----, 113 S.Ct. 2539 (1993), for its exercise of jurisdiction is misplaced. The court also discussed the recognized jurisdiction of federal courts to enjoin unauthorized agency action under the Leedom doctrine and then faulted USEPA for failing to direct the court "to a single case holding that this Court does not have jurisdiction to consider whether a federal agency's action or threatened action is beyond its jurisdiction." SOCCO II, 831 F.Supp. at 1332. What the court fails to appreciate is that the Leedom doctrine may only be invoked under severely limited circumstances. As defendants state, the court seemed to be operating under the assumption that "the mere assertion of a challenge to agency jurisdiction sufficed to invoke the court's jurisdiction under Leedom." This assumption is wrong. As discussed above, Leedom is implicated only when an agency's action (or threatened action) is manifestly outside of its delineated authority.
 
 
 52
 Here, USEPA's threatened action comes nowhere close to the unauthorized action contemplated by Leedom and its progeny. The CWA's structure bears striking similarities to that of the SMCRA. Like the SMCRA, the CWA sets up a system of "cooperative federalism," in which states may choose to be primarily responsible for running federally-approved programs. 33 U.S.C. Sec. 1342. USEPA approved Ohio's NPDES permitting system including its bypass provision; Ohio is thus a primacy state. Because a state may adopt permit conditions more stringent than federally required, 33 U.S.C. Sec. 1370(1), it may choose to not include a bypass provision in a permit. Where it does include a bypass provision, such provision must meet the standards set forth in 40 C.F.R. Sec. 122.41(m). Contrary to the District Court's interpretation of the CWA's regulatory scheme, USEPA retains independent enforcement authority in primacy states, 33 U.S.C. Sec. 1342(i), as does OSM under the SMCRA. Nothing in regulation 122.41(m) changes this residual authority in the area of bypass decisions made by state regulators in primacy states. Under both the CWA and the SMCRA, the responsible federal agency retains oversight power to ensure compliance with federal standards. As we discussed above, whenever USEPA learns that a person is in violation of the CWA or a NPDES permit, it must either issue a compliance order or bring a civil enforcement action seeking appropriate relief. 33 U.S.C. Sec. 1319(a). The District Court reasoned that because USEPA had not found a violation of the CWA, it was not required to act under section 1319. It then analyzed whether USEPA had any authority to act outside of section 1319. The court seems to be saying that while USEPA has jurisdiction to enjoin or sanction violations of the CWA, it has no investigatory authority to determine whether a violation has occurred in the first instance. We find that the grant of enforcement authority in section 1319 presupposes the authority to investigate alleged violations of the CWA. USEPA's threatened action was supported by statutory authority. We therefore hold that the District Court erred in finding it had jurisdiction under the Leedom doctrine.
 
 IV.
 
 53
 Accordingly, the judgment of the District Court enjoining the actions and threatened actions of OSM and USEPA is REVERSED and the case is REMANDED with instructions to dismiss for lack of jurisdiction.
 
 
 
 [1]
 Richard Seibel, Field Office Director, OSM; W. Hord Tipton, Acting Director, OSM; Carol Browner, USEPA Administrator; and Valdas V. Adamkus, USEPA Administrator, Region V are also defendants in this action
 
 
 [2]
 We draw heavily from the facts as set forth by the District Court in its published opinion. Southern Ohio Coal Co. v. Office of Surface Mining Reclamation & Enforcement, et al., 831 F.Supp. 1324, 1326-30 (S.D.Ohio 1993)
 
 
 [3]
 OSM has the authority to conduct "such inspections of any surface coal mining and reclamation operations as are necessary to evaluate the administration of approved State programs...." 30 U.S.C. Sec. 1267(a)
 
 
 [4]
 Defendants moved for a stay of the preliminary injunction, which this Court granted in part on August 30, 1993. We ordered the injunction stayed to permit "the USEPA to investigate and make findings with respect to any alleged violation of the Clean Water Act, and thereafter to act in accordance with its statutory authority pursuant to 33 U.S.C. Sec. 1319 if it finds that a violation has occurred." On September 3, 1993, USEPA, Region V, formally found a violation at Meigs 31 and issued a cessation order. Negotiations between the parties failed and SOCCO filed a motion for "an order requiring Defendants U.S. EPA, Carol Browner and Valdas Adamkus to show cause why they are acting contrary to [the District Court's] order and for an order nullifying U.S. EPA's cessation order." On September 22, 1993, the District Court granted SOCCO's show cause motion, nullified USEPA's cessation order and enjoined the United States from filing an enforcement action. USEPA then filed a "motion for clarification of partial stay pending appeal, for vacation of inconsistent court orders and for stay of contempt proceedings pending appeal" with this Court. We granted USEPA's motion on September 23, 1993, finding that the District Court is without jurisdiction to review USEPA's compliance order prior to the initiation of a civil enforcement action. See Southern Pines Assocs. v. United States, 912 F.2d 713, 716-17 (4th Cir.1990); Hoffman Group, Inc. v. EPA, 902 F.2d 567, 569 (7th Cir.1990)
 
 
 [5]
 If the first element is satisfied, we then ask "2) will the agency's expertise assist in resolving the jurisdictional issue; and 3) will exhaustion of administrative remedies result in irreparable harm to the claimant." Shawnee Coal, 661 F.2d at 1093
 
 
 [6]
 The court also held that OSM cannot act under section 1271(a)(1) for the same reason
 
 
 [7]
 The Congress finds and declares that--
 ....
 (f) because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States[.]
 30 U.S.C. Sec. 1201(f).
 
 
 [8]
 Mary Herald v. OSM, 123 IBLA 334 (1992) (5 1/2 months); Coal Energy, Inc. v. OSM, 119 IBLA 111 (1991) (3 1/2 months); Muskingum Mining Co. v. OSM, 113 IBLA 352 (1990) (over 5 months); and Valley Camp Coal Co. v. OSM, 112 IBLA 19 (1989) (4 years)
 
 
 [9]
 USEPA may also choose to first notify the state of the violation. If the state fails to take enforcement action within thirty days of the notification, "the Administrator shall issue [a compliance order] or shall bring a civil action...." 33 U.S.C. Sec. 1319(a)(1)
 
 
 [10]
 Since 1986, CERCLA has included a provision specifically precluding judicial review of pre-enforcement action. 42 U.S.C. Sec. 9613(h)