*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JULIA ANNE SHEARSON,

               *Plaintiff-Appellant*,

      v.

ERIC H. HOLDER, JR., Attorney General;
ROBERT MUELLER III, Director, Federal
Bureau of Investigation; TIMOTHY J. HEALEY,
Director, Terrorist Screening Center;
MICHAEL E. LEITER, Director of the National
Counterterrorism Center,

               *Defendants-Appellees*.

No. 11-4234

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-1492—Solomon Oliver, Jr., Chief District Judge.

Argued: November 29, 2012

Decided and Filed: August 5, 2013

Before: MARTIN, SILER, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gadeir A. Abbas, COUNCIL ON AMERICAN-ISLAMIC RELATIONS, Washington, D.C., for Appellant. Sharon Swingle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Gadeir A. Abbas, COUNCIL ON AMERICAN-ISLAMIC RELATIONS, Washington, D.C., for Appellant. Sharon Swingle, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge.   In January 2006, the United States Customs and Border Protection detained Julia Shearson, a U.S. citizen, and her daughter as they drove into the United States from Canada.  Customs searched Shearson's car and then allowed her to enter the country.  Shearson filed this lawsuit claiming violations of the Fifth Amendment's Procedural Due Process clause, the Equal Protection clause, the First Amendment, the Administrative Procedure Act, and the Privacy Act.  The district court dismissed all of Shearson's claims.  Shearson appeals the district court's holding regarding her due process claim—that Shearson failed to exhaust her administrative remedies by submitting an inquiry through the Traveler Redress Inquiry Program.  We agree with the district court that Shearson should have used the administrative remedies available and we **AFFIRM** the district court's judgment.

I.

Julia Shearson is the executive director of the Cleveland, Ohio chapter of the Council on American-Islamic Relations.  In 2006, U.S. Customs and Borders Protection stopped Shearson and her daughter as they were driving from Canada into the United States.  Customs removed her from her car, handcuffed her, and detained her for about two and one-half hours while they searched the car.  Shearson claims that, when the customs officer swiped her passport, an "armed and dangerous" warning came up.  Customs allowed Shearson to enter the United States, and Shearson filed a request under the Freedom of Information Act for documents related to her detention.  She then sued to compel disclosure of the documents, which ultimately led to the release of customs files.  The documents showed that Customs had detained and searched her because when Customs entered her name into its system, her name returned "an Armed and Dangerous" designation in Customs' terrorist database.  The documents also revealed that she was a "POSITIVE VGTOF," meaning her name was a positive match to the FBI's Violent Gang and Terrorist Organization File.  Shearson asked the FBI to meet

and discuss her alleged placement in its Violent Gang file.  The FBI responded to her request by stating that its policy was neither to confirm nor deny whether someone was listed in its terrorist and gang files or watchlists.  Instead, the FBI recommended that Shearson use an administrative remedy, the Department of Homeland Security's Traveler Redress Inquiry Program, which "serves as the central gateway for travelers to express concern when they believe they have been incorrectly delayed, denied boarding, identified for additional screening, or have otherwise experienced difficulties when traveling or seeking entry into the United States."  Shearson did not seek redress through the Redress Program and instead brought this action in district court.

Shearson believes that Customs detained her because her name appears in the Terrorist Screening database.  Created in 2003, the Terrorist Screening Center "consolidates the federal government's approach to terrorism screening and [ ] provides for the appropriate and lawful use of terrorist information in screening processes."  The Terrorist Screening Center maintains a database, called the Terrorist Screening Database, that compiles all the information about individuals suspected of or known to be involved in terrorist activity.  The Terrorist Screening Database disseminates this information to different watchlists that various U.S. security agencies use.  For example, information from the Database contributes to watchlists compiled by the FBI, the Transportation Security Administration, and the Department of State.

The Department of Homeland Security created the Traveler Redress Program in response to Congress's statutory mandate to "establish a timely and fair redress process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat."  49 U.S.C. § 44926. The statute specifically required the Department to create a process for people who have had trouble "boarding a commercial aircraft." *Id*. But the record in this case shows that the Program is used as a conduit for the complaints of those who enter and exit the United States by other means. The Department considers the Redress Program to be a "single, formal administrative redress process for a wide variety of claims, including: delayed or denied airplane boarding; delayed or denied entry into or exit from

the United States at a port of entry or border checkpoint; and continuous referral for additional (secondary screening)." The Program provides assistance to both misidentified travelers and also travelers who have been told they are on a government watchlist.

When a traveler experiences trouble going through security he or she submits a traveler inquiry form to the Traveler Redress Inquiry Program and receives a Redress Control Number, which can be used to check on the status of his or her inquiry or used when he or she books a flight. Upon receipt of the traveler-inquiry form, the Redress Program reviews the "information submitted by the traveler and routes it to the appropriate DHS component office . . . to determine whether the traveler is experiencing screening problems that relate to his or her placement on a government watchlist." If the traveler has been misidentified, then the Redress Program attempts to update and correct the information in the traveler's record. The traveler then receives a determination letter.

If a traveler has been positively identified as being on a watchlist not overseen by Homeland Security, then the record indicates that the Program will "work directly with the appropriate government agency to review the individual's record and receive a determination as to the person's watchlist status." If the traveler is a positive match to a name on the Terrorist Screening Database, then Homeland Security refers the inquiry to the Redress Unit of the Terrorist Screening Center. The record shows that the Terrorist Screening Center then, "in consultation with other agencies in the intelligence community, including the FBI and National Counterterrorism Center, will examine the underlying intelligence relating to the individual's watchlist status and make any necessary corrections or updates to the individual's watchlist status." The changes may sometimes result in the government's removal of the traveler's name from the terrorist database. If the traveler has been misidentified, then the Program attempts to update and correct the information in the traveler's record.

Finally, after the traveler's records have been reviewed, the Program sends a determination letter telling the traveler, in general terms, that the government has considered the traveler's case, and that the relevant government agencies have reviewed

the necessary documents.  However, the determination letters do not "disclose whether or not [the individual] was, or still is, included on a watchlist or if there is other government interest in the individual that may be considered law enforcement sensitive."

Shearson brought suit in the Northern District of Ohio, claiming her inclusion on a terrorist watchlist violated the Fifth Amendment's Due Process clause, the Equal Protection clause, the First Amendment, the Administrative Procedure Act, and the Privacy Act.  Shearson sought prospective declaratory and injunctive relief.  The government moved to dismiss the case, arguing that Shearson lacked standing to sue, and that she had failed to exhaust her administrative remedies by refusing to proceed through the Redress Program.

The district court granted the government's motion to dismiss.  For Shearson's due process claim, the court dismissed on the grounds of exhaustion only.  Regarding the due process claim, the court held that Shearson had demonstrated standing to sue, but that she had sued prematurely because the Redress Program could have possibly provided a remedy.  Shearson appeals the district court's decision, arguing that she should not be required to exhaust because the Redress Program does not provide a meaningful remedy for her injuries.  Shearson also asks this Court both to decide the merits of her due process claim and to use its powers to expunge the records the government maintains as support for her watchlist status.  In its response brief, the government maintains that Shearson lacks standing.

II.

We review determinations of standing de novo.  *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009).

The district court determined that Shearson had standing, and we agree.  To prove standing, a plaintiff must meet three requirements.  First, the plaintiff must have suffered an injury in fact, which is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citing *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010) (quotations omitted)).  "Second,

there must be a causal connection between the injury and the conduct complained of" — the injury has to be "'fairly . . . trace[able] to the challenged action of the defendant, and not . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (parallel citation omitted)). Third, it must be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43). The party invoking federal jurisdiction must prove each of these elements. *Id.* (citation omitted).

While this Circuit has not yet considered standing in terrorist watchlist cases, the Ninth Circuit held that whether a plaintiff has standing to bring a claim for removal from a government watchlist is "highly fact-dependent," and that a plaintiff must show she is "'realistically threatened' with concrete injury in the future." *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1256 n.9 (9th Cir. 2008) (citations omitted).

The government argues Shearson lacks standing to bring her due process claim because she has not suffered an injury in fact. The government claims that Shearson's injury is speculative because she has not proven that the government ever put her on a watchlist. But, as the Ninth Circuit and other district courts have noted, a traveler's subjection to heightened searches while entering the United States can be an indicator that an individual is on a terrorist watchlist. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 992–93 (9th Cir. 2012); *Scherfen v. U.S. Dep't of Homeland Sec.*, No. 3:CV-08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ("The complaint thus supports a fair inference that Plaintiffs have experienced intensified screening as a result of inclusion in the [Terrorist Screening Database], indicating that the alleged harm could be avoided by the requested injunctive relief."). Here, Customs subjected Shearson to a heightened search when she crossed the border in 2006. As a result of her Freedom of Information Act litigation, Shearson received documentation showing that her name was a positive match to a name on the Violent Gang list. This evidence supports finding that Shearson suffered an injury. The government's argument that Shearson cannot

prove that she remains in the terrorist database is not persuasive—the government does not release information on whether a person continues to be listed in the terrorist database or on terrorist watchlists, and it is impossible for Shearson to prove that her name remains on that list. Unless the government provides documentation on Shearson's watchlist status, we will presume that Shearson's status remains the same. Furthermore, Shearson argues not only that the government wrongly detained her in 2006, but also that, by remaining on the list, the government is "constrain[ing] her right to travel freely internationally, to be treated like others situated similarly to her, and has subjected her to the stigma that attends placement on a government watchlist." Shearson's past detention, in conjunction with the presumption that she remains on terrorist watchlists, make it likely she is "realistically threatened" with future injury. *Ibrahim*, 538 F.3d at 1256 n.9; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

We conclude that Shearson had standing to bring her case.

### III.

We review de novo a court's dismissal of a case for failure to exhaust administrative remedies. *Curry v. Scott*, 249 F.3d 493, 503 (6th Cir. 2001).

The exhaustion doctrine both allows agencies to "apply [their] special expertise in interpreting relevant statues" and promotes judicial efficiency. *Cent. States, Se. & Sw. Areas Pension Fund v. 888 Corp.*, 813 F.2d 760, 764 (6th Cir. 1987) (citations omitted); *see also McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) ("The exhaustion doctrine also acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."). To determine whether a plaintiff should have exhausted administrative remedies before bringing a claim, we must first look to congressional intent. *McCarthy,* 503 U.S. at 144. Here, the government concedes that there is no discernible congressional intent because 49 U.S.C. § 44926 does not require administrative exhaustion.

When "Congress has not clearly required exhaustion, sound judicial discretion governs" whether or not exhaustion should be required. *Id.* (citing *McGee v. United States,* 402 U.S. 479, 483 n.6 (1971)) (rest of citation and parenthetical omitted).[1] This discretion requires "fashioning [ ] exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." *Id.* (citation omitted); *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 501 (1982) ("[C]ourts play an important role in determining the limits of an exhaustion requirement and may impose such a requirement even where Congress has not expressly so provided.").

While a court has discretion to fashion exhaustion requirements, there are some exceptions to the exhaustion doctrine. For example, exhaustion may not be required when the administrative remedy "does not serve the purposes behind the exhaustion doctrine[]," if the "administrative remedies are inadequate or not efficacious," or "where pursuit of administrative remedies would be a futile gesture." *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1093 (6th Cir. 1981) (citation omitted). Additionally, "[e]xhaustion of administrative remedies may not be required in cases of non-frivolous constitutional challenges to an agency's procedures." *Bangura v. Hansen*, 434 F.3d 487, 493 (6th Cir. 2006) (citing *S. Ohio Coal Co. v. Office of Surface, Mining, Reclamation and Enforcement*, 20 F.3d 1418, 1425 (6th Cir. 1994)).

Shearson appeals the district court's dismissal of the case for failure to exhaust administrative remedies for three reasons. First, Shearson argues that she is bringing a non-frivolous constitutional challenge to the Terrorist Screening Center's procedures for compiling the terrorist database and the Redress Program will not provide constitutional review of her claim. Second, she argues that the Redress Program is an inadequate

---

[1]It is unclear whether Shearson would be required to exhaust under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 704; *Darby v. Cisneros,* 509 U.S. 137, 146–47 (1993). Under *Darby v. Cisneros*, a court cannot require exhaustion if, under the APA, the agency action is considered final and the neither the statute nor agency rule requires exhaustion. *Id.* In cases not governed by the APA, the exhaustion doctrine continues to apply. *Id.*

In supplemental briefing, Shearson argues that under *Darby* her "APA claim must move forward." That may well be; however, Shearson abandoned her APA claim. Shearson brought an APA claim in the district court, which the district court dismissed on standing grounds. She made a decision not to appeal that claim and we decline to consider it now. *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal." (citing *Enertech Elec., Inc. v. Mahoning Cnty Comm'rs,* 85 F.3d 257, 259 (6th Cir.1996))).

administrative procedure because it was created to solve the problems of air travelers who have been misidentified as being on the terrorist watchlist. Shearson alleges that the Redress Program is not a process for resolving the problems of individuals actually on the watchlist or of land travelers. Finally, Shearson argues that the Redress Program is inadequate because only the Terrorist Screening Center, not Homeland Security, can grant her relief and there is "doubt as to whether the agency was empowered to grant effective relief." *McCarthy*, 503 U.S. at 147 (1992) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 575 n.14 (1973) (parallel citation omitted)).

While there are deficiencies in the Redress Program process, we agree with the district court that Shearson should be required to exhaust her administrative procedures by submitting a traveler inquiry form through the Redress Program before she can proceed with this case. There is very little guidance in any Circuit considering administrative exhaustion as it pertains to the Redress Program and there is no case law in this Circuit. However, when considering the purposes of the exhaustion doctrine, making Shearson submit a Traveler Redress inquiry is reasonable to promote judicial efficiency and allow the agencies involved an opportunity to resolve problems with their procedures.

Shearson is correct that exhaustion need not be required for non-frivolous constitutional challenges. *S. Ohio Coal Co.*, 20 F.3d at 1425. However, this does not mean that all non-frivolous constitutional challenges are free from exhaustion requirements. *Ghaffar v. Mukasey*, 551 F.3d 651, 655 (7th Cir. 2008) (citations omitted) (holding that plaintiffs who bring a due process claim "based on a procedural failing that the [agency] could have remedied" will not excuse failure to exhaust); *Shurney v. INS*, 201 F. Supp. 2d 783, 789 (N.D. Ohio 2001) (holding exhaustion not required where administrative relief will be ineffective and futile). Here, requiring exhaustion and forcing Shearson to go through the Redress Program's inquiry process may help remove her from the terrorist list and help end her continuing injury.

Shearson is right that there is no express statutory grant to the Redress Program to deal with constitutional claims brought against the Terrorist Screening Center. She

is also right that Homeland Security runs the Redress Program and her issues are with the Terrorist Screening Center, a section of the FBI. However, this does not mean that her submitted inquiry will go un-reviewed. While the Department of Homeland Security administers the Program, the Terrorist Screening Center still reviews traveler inquiries submitted through the process. *Redress Procedures*, TERRORIST SCREENING CENTER (Apr. 19, 2012), http://www.fbi.gov/about-us/nsb/tsc/tsc_redress. The Terrorist Screening Center does not have its own redress unit that deals directly with the public and its website directs any travelers who have problems with Terrorist Screening Center watchlists to submit a proper inquiry through the Traveler Redress Inquiry Program. *Id.* Allowing the Terrorist Screening Center to use its expertise to try and resolve Shearson's claim through the Redress Program is prudent.

Additionally, forcing Shearson to advance her claims through the Program will promote judicial efficiency, despite the Redress Program's shortcomings. There are thousands of people on the government's terrorist watchlists, and there are thousands more people each year whom the government misidentifies as being on the lists. The Redress Program procedures help force an internal review of the data and may lead to the removal of a person's name from the terrorist database. While the Redress Program's determination letters do not provide a direct answer for travelers about whether the terrorist watchlist has included or continues to include them, the Redress Program review process creates a record that may be reviewed by a judge *in camera. Scherfen*, 2010 WL 456784, at *8. This record will help a court better determine the issues, determine whether a plaintiff has standing, and whether the plaintiff's claim is moot. *Id.* Making it easier for plaintiffs to bypass the Redress Program will burden the courts when many cases can be easily resolved.

IV.

In addition to arguing that she does not need to proceed with her claim through the Redress Program, Shearson also asks this Court to consider deciding her due-process claim on the merits. We need not consider this argument because we hold that Shearson has not exhausted her administrative remedies.

V.

Lastly, Shearson requests this Court use its equitable powers to expunge all the government records held by the Terrorist Screening Center that supported its placement of her in the terrorist databases.  Despite having no information on what those documents hold, Shearson asks this Court to find in her favor because, she claims, the injury to her outweighs the documents' utility to the government.  We refuse to entertain this argument.

VI.

We **AFFIRM** the district court.