RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ADAM KANUSZEWSKI, et al.,

*Plaintiffs-Appellants*,

*v.*

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES; NICK LYON; SANDIP SHAH; SARAH LYON-CALLO; MARY KLEYN; MICHIGAN NEONATAL BIOBANK, INCORPORATED, aka Michigan Neonatal Biorepository; ANTONIO YANCEY,

*Defendants-Appellees*.

No. 18-1896

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:18-cv-10472—Thomas L. Ludington, District Judge.

Argued: March 13, 2019

Decided and Filed: June 10, 2019

Before: MERRITT, CLAY, and ROGERS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellants. Thomas F. Cavalier, WAYNE STATE UNIVERSITY, Detroit, Michigan, for Appellee Antonio Yancey in his individual capacity. Jeremy C. Kennedy, PEAR SPERLING EGGAN & DANIELS, Ann Arbor, Michigan, for Appellees Neonatal BioBank and Antonio Yancey in his capacity as Director of the Michigan Neonatal BioBank, Inc. Aaron Levin, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees Michigan Department of Health and Human Services, Nick Lyon, Sandip Shad, Sarah Lyon-Callo, and Mary Kleyn. **ON BRIEF:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellants. Thomas F. Cavalier, WAYNE STATE UNIVERSITY, Detroit, Michigan, for Appellee Antonio Yancey in his individual capacity. Jeremy C. Kennedy,

Jerold Lax, PEAR SPERLING EGGAN & DANIELS, Ann Arbor, Michigan, for Appellees Neonatal BioBank and Antonio Yancey in his capacity as Director of the Michigan Neonatal BioBank, Inc.  Aaron Levin, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees Michigan Department of Health and Human Services, Nick Lyon, Sandip Shad, Sarah Lyon-Callo, and Mary Kleyn.

CLAY, J., delivered the opinion of the court in which MERRITT and ROGERS, JJ., joined.  ROGERS, J. (pp. 34–35), delivered a separate concurrence.

_____

**OPINION**

_____

CLAY, Circuit Judge.  Plaintiffs Adam and Ashley Kanuszewski, Shannon Laporte, and Lynnette Wiegand, individually and as parent-guardians to their minor children, appeal the district court's grant of a motion to dismiss Plaintiffs' claims filed by Defendants Michigan Department of Health and Human Services and its employees[1] being sued in their official and individual capacities; and Michigan Neonatal Biobank, Incorporated, and its Director, Dr. Antonio Yancey, sued in his official and individual capacities.  For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

Plaintiffs' alleged constitutional violations concern Michigan's Newborn Screening Program ("NSP").  The NSP, which Michigan has operated since the 1960s, involves Defendant Michigan Department of Health and Human Services and its agents collecting blood samples (sometimes referred to as "blood spots") with a filter paper collection device known as a Dried Blood Spot card from nearly every newborn baby in Michigan, to test for various diseases.  On April 30, 2018, Plaintiffs filed their First Amended Complaint for Injunctive and Declaratory

_____

[1]These employees are Nick Lyons, Dr. Sandip Shah, Dr. Sarah Lyon-Callo, and Mary Kleyn.  Harry Hawkins was named as a defendant in the complaint but has since died, and the dismissal of Plaintiffs' claims against him are not on appeal.

Relief with Possible Money Damages for Constitutional Violations.   According to the Complaint,[2] the facts are as follows:

Plaintiffs Adam Kanuszewski and Ashley Kanuszewski have three minor children born over the last eleven years.  Plaintiff Shannon Laporte has two minor children born over the last eleven years.  Plaintiff Lynnette Wiegand has four minor children born over the last eight years. The Complaint alleges, with respect to the NSP, that blood is drawn from newborns without the consent or knowledge of the newborns' parents.  Once collected, the blood samples are tested for over fifty maladies, disorders, or diseases.  Defendants retain the samples after screening them for these diseases; the samples are transferred to Defendant Michigan Neonatal Biobank, a non-profit corporation, under the custody and control of Defendant Dr. Antonio Yancey, where they are stored for future use by the state.  Plaintiffs allege that Defendants lack parental consent to retain, transfer, store, or otherwise use the children's blood samples after they have been screened for diseases.[3]

Plaintiffs allege that despite Defendants' assurances that all blood samples are secure and not identifiable to the individuals from whom they were taken, some samples kept in storage at the Neonatal Biobank have been given up pursuant to state court orders and some samples either have been or are in the process of being sold to third-party businesses and researchers.  Plaintiffs do not allege that the children's specific blood samples have been sold or given up pursuant to a court order.

Plaintiffs allege that Defendants violated their substantive due process rights by not allowing them to decide whether to accept or reject the medical procedure in question prior to the collection of their babies' blood.  Plaintiffs allege that Defendants "deprived the Infants [of] their

---

[2]Plaintiffs argue that the district court "authorized [], at least in part," Defendants' allegedly improper attachment of documents to its motion to dismiss. (Appellants' Br. 41–49.)  Because we review *de novo* the district court's decisions in this case, *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012), and because we may decide the issues on appeal without reference to any documents attached to Defendants' motion to dismiss, we need not address the matter of the attachment.

[3]The Complaint seems to equivocate slightly, stating that "[a]t some point during the hospital stay for the birth of the Infants, the Parents might have been presented with a card giving the Parents an option of whether they wanted their Infants' *already* illegally seized and tested blood to be donated to medical research"—but Plaintiffs allege that any purported consent was "not general or informed" and was therefore ineffective.  (R. 26, Complaint, Page ID# 313.)

liberty interest in their guardians self-making informed personal and private medical procedure decisions without due process of law." (R. 26, Complaint, Page ID# 325.)  Plaintiffs allege that collecting the blood samples constituted an unconstitutional search or seizure under the Fourth Amendment.  Plaintiffs allege that the transfer of the samples to, and the samples' storage with, Defendant Neonatal Biobank constituted a further, ongoing seizure for which the Neonatal Biobank was "a state actor or . . . otherwise liable via civil conspiracy under 42 U.S.C. § 1983 despite being formed as a non-profit domestic corporation."  (R. 26, Complaint, Page ID# 328, 329.)

Plaintiffs seek declaratory judgment declaring Defendants' conduct violative of the Fourth and Fourteenth Amendments.  Plaintiffs seek many forms of prospective injunctive relief, including the following: to halt "the illegal processes and procedures"; to halt continued possession and retention of all blood samples taken, transferred, or stored without informed consent; and to command Defendants "to destroy all data collected or extracted regarding the Infants, and return to the Parents all blood samples and spots of the Infants" that were obtained without informed consent.  (R. 26, Complaint, Page ID# 329–32.)  Finally, Plaintiffs seek damages in connection with Defendants' alleged constitutional violations.

Defendants filed motions to dismiss Plaintiffs' claims.  After briefing, the district court granted Defendants' motions to dismiss and dismissed Plaintiffs' Complaint with prejudice.  Plaintiffs then filed this timely appeal.

**DISCUSSION**

Plaintiffs allege that Defendants, through their operation of and participation in the NSP, have violated and continue to violate their substantive due process rights because blood is drawn from the children and retained without parental consent.  Plaintiffs also allege that Defendants have violated and continue to violate the Fourth Amendment rights of the children because drawing the children's blood constituted a search for which a warrant was required.  Before we analyze whether Defendants have violated Plaintiffs' constitutional rights, we will address the question of Plaintiffs' standing to bring these claims.

## I.  Standing

Defendants argue that Plaintiffs lack standing to bring their claims.

This Court reviews *de novo* determinations of standing.  *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013).  Because standing doctrine comes from Article III's case-or-controversy requirement, it is jurisdictional and must be addressed as a threshold matter. *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017).  Standing requires Plaintiffs to show 1) that they have suffered an injury-in-fact that was 2) caused by Defendants' conduct and that 3) this Court can likely redress the injury with a decision for Plaintiffs. *Id.* at 315–16.  Plaintiffs, as the parties invoking federal jurisdiction, bear the burden of proving the three elements of standing. *Shearson*, 725 F.3d at 592.  At the pleadings stage, a plaintiff "must 'clearly . . . allege facts demonstrating' each element."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

The questions of standing in this case concern the injury-in-fact requirement.  To satisfy this requirement, Plaintiffs must allege that they "have suffered an injury in fact, which is 'concrete, particularized, and actual or imminent.'"  *Shearson*, 725 F.3d at 592 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  The threat of future harm can satisfy this requirement as long as there is a "substantial risk" that the harm will occur. *Clapper*, 568 U.S. at 414 n.5 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010).  By the same token, "'[a]llegations of *possible* future injury' are not sufficient."  *Id.* at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  The Supreme Court has noted that "a highly attenuated chain of possibilities [] does not satisfy the requirement that threatened injury must be certainly impending." *Id.* at 410.

The distinction between past and ongoing or future harms is significant because the type of harm affects the type of relief available.  Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief.  This is because the fact that a harm occurred in the past "does nothing to establish a real and immediate threat that" it will occur in the future, as is required for injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).  Obtaining standing for declaratory relief has the same requirements as obtaining

standing for injunctive relief. *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.").

Our standing analysis in this case is complicated because Plaintiffs raise numerous claims, each of which must independently meet the requirements for standing. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Further, within each claim we must determine whether the alleged harm affords Plaintiffs standing to seek injunctive and declaratory relief, or only damages. Accordingly, to properly analyze standing, we will disaggregate Plaintiffs' claims and the forms of relief sought. *See Town of Chester*, 137 S. Ct. at 1650.

As a brief overview, there are two types of constitutional violations alleged (substantive due process and the Fourth Amendment) and two types of Plaintiffs (the parents and the children). Under the broader heading of substantive due process, Plaintiffs allege violations of the "*children's* right to refuse medical treatment" and of the "*parents'* own fundamental liberty interest in the care, custody and management of their children."[4] (Appellants' Br. 21 (emphasis added).) Plaintiffs also claim that Defendants violated the *children's* Fourth Amendment rights. With respect to the temporal aspect of their harm, Plaintiffs complain of the *completed* collection

---

[4]Defendants argue that because Plaintiffs captioned their Complaint as "[Parents' names] as parent-guardians and next friend to their minor children," only the rights of the children—not their parents—are before us. (Appellee State Defendants' Br. 13–14.) Rule 17(c) of the Federal Rules of Civil Procedure allows an action to be brought on behalf of a minor by "a general guardian" or if the minor "does not have a duly appointed representative . . . by a next friend." Fed. R. Civ. P. 17(c). Rule 10(a) requires that a complaint's title "name all the parties." Fed. R. Civ. P. 10(a). If the Plaintiffs intended to raise the rights of the parents, they might instead have captioned their case "[Parents' names], individually, and as parent-guardians and next friend to their minor children . . ."; however, "errors in captions are common and need not 'be viewed as [] fatal defect[s].'" *Hawkins v. Wash. Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 101 (D.D.C. 2018) (quoting 5A Wright & Miller, Federal Practice & Procedure § 1321 (3d ed. 2004 & Supp. 2017)). Our touchstone is adequate notice, and the Federal Rules of Civil Procedure "evidence a 'clear preference to resolve disputes on their merits.'" *Hawkins*, 311 F. Supp. 3d at 102 (quoting *Cohen v. Bd. of Trustees of the Univ. of Dist. of Columbia*, 819 F.3d 476, 482–83 (D.C. Cir. 2016)). Because the Complaint provided Defendants adequate notice that the parents were asserting their own rights in addition to those of their children, Plaintiffs' claims involving the rights of the parents are properly before us. (*See* R. 26, Complaint, Page ID# 305 ("Plaintiffs in this action are the Infants themselves and each parent as parents-guardians of one or more children born in the State of Michigan."))

of the children's blood samples, as well as the *ongoing* storage of the samples and the risk of the *future* use of the samples by third parties.

To simplify this complex analysis, we will divide it into four relevant questions: 1) Did the children suffer an injury-in-fact when blood samples were taken from them? 2) Did their parents suffer an injury-in-fact when their children's blood samples were taken? 3) Do the children suffer an injury-in-fact from either the ongoing storage of their samples or the risk of future use of the samples? 4) Do the parents suffer an injury-in-fact from either the ongoing storage of their children's samples or the risk of future use of the samples? The answers to these questions may determine whether and in what forms Plaintiffs may seek relief under each of their claims.

1. **Whether the children suffered an injury-in-fact when blood samples were taken from them**

Plaintiffs assert that the children have standing to raise claims for injunctive and declaratory relief and damages based on injuries that occurred when their blood was initially drawn and screened for diseases. Plaintiffs argue that the children's substantive due process right to have their parents direct their medical care was violated when Defendants drew a sample of the children's blood without first obtaining parental consent, and that this drawing of blood constituted an injury-in-fact affording the children standing to pursue their substantive due process claims. Plaintiffs also claim that the children's Fourth Amendment rights were violated when Defendants drew a sample of the children's blood because this constituted a warrantless search to which no exception to the warrant requirement applied, and that this drawing of blood constituted an injury-in-fact affording the children standing to pursue their Fourth Amendment claims. Because the blood samples have already been collected, the children's Fourth and Fourteenth Amendment claims arising out of the initial drawing of blood both pertain to a *completed* harm and therefore afford the children standing to seek only damages—not injunctive or declaratory relief—resulting from this alleged violation. *See Lyons*, 461 U.S. at 105.

We begin our injury-in-fact analysis by noting that it can be very invasive to draw an individual's blood. Drawing blood involuntarily denies an individual bodily autonomy and interferes with one's bodily integrity. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). Drawing

blood can also violate one's privacy by revealing sensitive, confidential information about that individual. *See id.*; *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (noting that "chemical analysis of urine, [or] blood, can reveal a host of private medical facts about an [individual], including whether he or she is epileptic, pregnant, or diabetic").

With respect to their Fourth Amendment claims, Plaintiffs allege that the children's Fourth Amendment rights were violated when the state drew a blood sample from them and tested it for diseases. Our standing analysis does not consider the merits of Plaintiffs' claims; instead, we must assume that "if proved in a proper case," Defendants' alleged practices "would be adjudged violative of the [Plaintiffs'] constitutional rights." *Warth*, 422 U.S. at 502. The completed harm from Defendants' alleged Fourth Amendment violation affords the children standing to seek damages, but because there is no allegation that the state will once again collect blood from the children in the future, the children lack standing to pursue a claim for injunctive or declaratory relief. *See Lyons*, 461 U.S. at 105 (denying standing to pursue injunctive relief because the fact "[t]hat Lyons may have been illegally choked by the police . . . , while presumably affording Lyons standing to claim damages . . . , does nothing to establish a real and immediate threat that he would again [be illegally choked]").

With respect to Plaintiffs' substantive due process claim, this same reasoning applies. The completed harm from Defendants' alleged substantive due process violation affords the children standing to seek damages, but there is no allegation of a real or immediate threat that the state will do so again.

Thus, with respect to their Fourth Amendment and substantive due process claims concerning the initial drawing of blood, the children have standing to pursue damages but not injunctive or declaratory relief.

### 2.  Whether the parents suffered an injury-in-fact when their children's blood samples were taken

Plaintiffs similarly assert that the parents have standing to raise claims for injunctive and declaratory relief and damages based on injuries that occurred when their children's blood was initially drawn and screened for diseases. Plaintiffs argue that the parents' substantive due

process right to direct their children's medical care was violated when Defendants drew a sample of the children's blood without first obtaining parental consent, and that this drawing of blood constituted an injury-in-fact affording the parents standing to pursue their substantive due process claims. But this is a *completed* harm that only gives the parents standing to pursue damages resulting from this alleged violation. *See Lyons*, 461 U.S. at 105.

If parents have a substantive due process right to make decisions relating to their children's medical care, then the parents in this case have suffered an injury-in-fact from having been denied the exercise of the right, which affords them standing to pursue damages. However, the parents cannot seek prospective relief because they do not allege a real or immediate threat that the state will repeat the alleged violation. Perhaps the parents could have argued (although they did not) that the threat remains because they have the ability to have more children, who would at birth be subject to having their blood drawn, which would again infringe upon the parents' substantive due process rights. However, even if this argument were raised, without further description of the parents' concrete reproductive plans it would be foreclosed by the Supreme Court's decision in *Lujan v. Defenders of Wildlife*. 504 U.S. 555, 564 (1992) ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Thus, like the children, the parents have standing to pursue damages, but not injunctive or declaratory relief with regard to the initial taking of the blood samples from the children.

### 3. Whether the children suffer an ongoing injury-in-fact from the storage of their samples or face a substantial risk of future harm from the use of their samples

Plaintiffs argue that the children have standing to raise claims for injunctive and declaratory relief and damages based on ongoing injuries and the threat of further injuries resulting from the transfer and storage of their blood samples, which they allege violated the Fourth and Fourteenth Amendments. Because the storage of the blood samples represents an ongoing violation, the children will be able to pursue all three forms of relief, *i.e.*, injunctive, declaratory, and damages, in connection with both their Fourth and Fourteenth Amendment claims.

We begin with Plaintiffs' claims relating to the children's Fourth Amendment rights. Plaintiffs allege violations of the children's Fourth Amendment rights in connection with Defendants' transfer and storage of the blood samples. Assuming that the storage is a Fourth Amendment violation, it is the sort of actual, ongoing harm that affords a plaintiff standing to sue for damages, as well as injunctive and declaratory relief. *See National Wildlife Federation v. U.S. Army Corps of Engineers*, 170 F. Supp. 3d 6, 14 (D.D.C. 2016) ("Still viable at this juncture is the conservation groups' claim of an actual ongoing harm to their recreational and aesthetic interests, which supports standing . . . ."). Thus, Plaintiffs have alleged an injury-in-fact sufficient for standing to seek all three types of relief.

With respect to Plaintiffs' claims relating to the children's substantive due process rights, Plaintiffs assert two types of injury. One asserted injury is too speculative to constitute an injury-in-fact for prospective relief, but the other provides the children with standing for all three types of relief sought.

In their complaint, Plaintiffs allege that the children's samples were sent to the Neonatal Biobank and that it is within the bank's power to sell or otherwise use the samples for state purposes, even if it has not yet done so. At no point in this litigation have Defendants denied that the Neonatal Biobank possesses such authority—though this might be because no Defendant has yet answered Plaintiffs' Complaint. Nor have Defendants denied that the state has a present or future commercial interest in the blood samples, inasmuch as the Neonatal Biobank may wish to sell these samples to third parties. Plaintiffs also allege that "there are no statutory legal protections on who may access, use, or utilize the private medical and genetic information of the Infants." (R. 26, Complaint, Page ID# 317.) Drawing on these allegations, Plaintiffs' first asserted injury is their fear of "the misuse of that information" and "the possibility of discrimination against their Infants and perhaps even relatives through the use of such blood samples and research activity thereon." (*Id.*, Page ID# 320–21.) Plaintiffs argue their fears are "well-founded" since blood spots have "resulted in the arrest of an alleged killer" and "the wrongful arrest of persons who were not guilty of any crime." (*Id.*, Page ID# 318.)

Plaintiffs' first asserted injury does not meet the injury-in-fact requirement, because it relates to a possibility of future harm that is not concrete, particularized, or imminent.[5] The Supreme Court has explained that an alleged future harm cannot be "too speculative . . . [but rather must be] *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Lujan*, 504 U.S. at 564 n.2). The Court clarified that this does not require "literal[] certain[ty]" but at least a "substantial risk" that the harm will occur. *Id.* at 414 n.5 (quoting *Monsanto Co.*, 561 U.S. at 153).

The primary problem with Plaintiffs' first asserted injury is that for the injury to occur, the researchers or businesses will have to use the "deeply private medical and genetic information" contained in the blood samples to discriminate against the children or their families, or otherwise harm them. (R. 26, Complaint, Page ID# 320.) The Supreme Court has made clear that "mere[] speculat[ion] and . . . assumptions about" how the government will operate one of its programs is not a sufficiently particularized harm to meet the injury-in-fact requirement. *Clapper*, 568 U.S. at 412. This is true even where the government has the power to do what a plaintiff fears it might. *Id.* Plaintiffs have not alleged facts that demonstrate a substantial risk that they will suffer discrimination. Rather, Plaintiffs' first theory of harm consists largely of speculation and therefore cannot satisfy the injury-in-fact requirement. *Cf. Clapper*, 568 U.S. at 410 (finding no injury-in-fact where plaintiffs feared that a series of events would occur which would ultimately result in harm because the threat of harm was too speculative).

Plaintiffs' second theory of injury relates to the infringement of the children's protected privacy interests, and this theory is more persuasive. This theory affords the children standing to

---

[5]Defendants also argue that this is not a cognizable harm because a parent or guardian may request that a blood sample not be used for research "by contacting [the Department of Community Health] by telephone or mail" or request that a sample be destroyed if they provide information "to confirm that they have authority to make such a request." (R. 26-3, MDCH Manual, Page ID# 336.) The existence of these options, Defendants argue, means that "there is a remedy available outside of litigation to prevent th[e] speculative harm [of misuse or discrimination] from occurring." (Appellee Biobank Br. 9.) However, Defendants cite no cases explaining what the significance of alternate remedies being available has in standing analysis, and Plaintiffs correctly point out that this argument suggests there is an exhaustion-of-remedies requirement to § 1983 claims, which Supreme Court precedent has expressly rejected. *See Monroe v. Pape*, 365 U.S. 167, 183 (1961) ("The federal remedy [under § 1983] is supplementary to [any] state remed[ies], and the latter need not be first sought and refused before the federal one is invoked.").

pursue damages, as well as prospective relief, in connection with their substantive due process claims relating to the transfer and ongoing storage of their blood samples.

With respect the children's standing to pursue damages, the Supreme Court has held that conducting chemical analysis on blood samples invades the subject's privacy interests. *Skinner*, 489 U.S. at 616. This is because "chemical analysis of urine, [or] blood, can reveal a host of private medical facts about an [individual], including whether he or she is epileptic, pregnant, or diabetic." *Id.* at 617. Therefore, if we assume that Defendants violated the children's substantive due process rights when they tested the blood samples for various diseases, the children have suffered a completed injury-in-fact based on Defendants' infringement upon their privacy interest, which affords them standing to seek damages. *See Lyons*, 461 U.S. at 105.

Further, with respect to prospective relief, there is a substantial risk that additional chemical analysis of the samples will occur, meaning that this second theory of injury affords the children standing to seek injunctive and declaratory relief as well. The problem with the chain of inferences in the first theory of injury is that it is too speculative to assert that third parties may use the information contained in the blood samples to discriminate against Plaintiffs. However, it is not too speculative to assert that the state or third parties may conduct chemical analysis on the blood samples—indeed, Plaintiffs allege that this is the very reason why the state retains the samples and why third parties wish to obtain them. *Cf. Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (finding injury-in-fact where hackers had obtained plaintiffs' data but had not yet misused it because "a reasonable inference can be drawn that the hackers will use the victims' data for" fraudulent purposes). Because there is a substantial risk that the children will suffer further harm if and when the state or third parties conduct chemical analysis on the children's samples, the children have standing to pursue prospective relief.

Thus, the children have standing to seek injunctive and declaratory relief, as well as damages, in connection with their Fourth and Fourteenth Amendment claims relating to the transfer and storage of their blood samples.

**4. Whether the parents suffer an ongoing injury-in-fact from the storage of their children's samples or face a substantial risk of future harm from the use of the samples**

Finally, Plaintiffs assert that the parents have standing to raise claims for injunctive and declaratory relief and damages based on ongoing injuries and the threat of further injuries resulting from the transfer and storage of their children's blood samples, which they allege violate the Fourteenth Amendment. The parents have standing to seek all three forms of relief.

The Complaint states that "the Parents are concerned and fear about the misuse of that information and fear the possibility of discrimination against their Infants and perhaps even relatives through the use of such blood samples and research activity thereon." (R. 26, Complaint, Page ID# 320–21.) This fails as an injury-in-fact for the reasons discussed in the previous section. However, the parents *do* have standing to pursue injunctive and declaratory relief, as well as damages, in connection with their claim that the ongoing storage of their children's blood samples violates their substantive due process rights to direct and control the medical care of their children.

Plaintiffs argue that the Fourteenth Amendment protects parents' rights to direct the medical care of their children. For purposes of our standing analysis, we assume that Plaintiffs will be able to prove that the transfer and storage of their children's blood samples violates the parents' substantive due process rights. The Supreme Court has held that parents have standing when the state interferes with their right to control the upbringing of their children, as when parents' "impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 n.22 (1982) (discussing *Abington School District v. Schempp*, 374 U.S. 203 (1963)); *accord Caldwell v. Craighead*, 432 F.2d 213, 220 (6th Cir. 1970) ("In challenging the constitutionality of [certain] types of religious services, there is sufficient interest to sue if the parties are either students enrolled in the institution where the services are carried on or are parents of the students."). Just as it represents a harm to parents when the state denies them their right to direct the education and religious upbringing of their children, it represents a harm when the state denies parents the right to direct the medical care of their children. The parents in this case allege that they are

being denied their right to direct the medical care of their children by Defendants' ongoing storage of the blood samples without parental consent and will be further denied this right if the state conducts research using the samples or transfers the samples to third parties. These alleged harms afford the parents standing to seek injunctive and declaratory relief, as well as damages, in connection with the storage of their children's blood samples.

In sum, the claims for which Plaintiffs have standing[6] are as follows: 1) a claim for damages based on the alleged violation of the children's substantive due process rights when their blood samples were collected and screened for diseases; 2) a claim for damages based on the alleged violation of the parents' substantive due process rights when their children's blood samples were collected and screened for diseases; 3) a claim for damages, as well as injunctive and declaratory relief, based on the alleged violation of the children's substantive due process rights by Defendants' retention and ongoing storage of their blood samples; 4) a claim for damages, as well as injunctive and declaratory relief, based on the alleged violation of the parents' substantive due process rights by Defendants' retention and ongoing storage of their children's blood samples; 5) a claim for damages based on the alleged violation of the children's Fourth Amendment rights when their blood samples were collected and screened for diseases; and 6) a claim for damages, as well as injunctive and declaratory relief, based on the alleged violation of the children's Fourth Amendment rights by Defendants' retention and ongoing storage of their blood samples.

We will first address Plaintiffs' four substantive due process claims, and then address their two Fourth Amendment claims.

---

[6]With respect to the other two standing requirements, there is no question that Plaintiffs' alleged harms have "'a causal connection [with] the conduct complained of' [and are] 'fairly . . . trace[able] to the challenged action of [Defendants], and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Shearson*, 725 F.3d at 592 (quoting *Lujan*, 504 U.S. at 560–61). The causation requirement is therefore met with respect to these claims. And because it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision,'" the redressability requirement is met as well. *Id.* (quoting *Lujan*, 504 U.S. at 561).

## II.  Substantive Due Process Claims

### Standard of Review

"We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012).  To survive a motion to dismiss, a complaint "does not need detailed factual allegations," but should identify "more than labels and conclusions." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A complaint also "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

### Analysis

Plaintiffs' substantive due process claims involve Defendants' alleged violations of both the children's right to direct their own medical care and the parents' rights to direct the medical care of their children.  Plaintiffs claim that the parents' and children's rights were violated when the children's blood was drawn and screened for diseases, as well as by Defendants' retention and ongoing storage of the children's blood samples and the threat of future use of those samples.  This section will address each of these issues.

### 1.  Alleged Violation of the Children's Substantive Due Process Rights When Blood Samples Were Collected

Plaintiffs seek damages based on the alleged violation of the children's substantive due process rights when their blood samples were collected and screened for diseases.  Defendants claim that damages are precluded by state sovereign immunity and qualified immunity.

State sovereign immunity generally bars damages actions against states from proceeding in federal court.  *Maben v. Thelen*, 887 F.3d 252, 270 (6th Cir. 2018).[7]  This immunity also generally applies to "state agents and instrumentalities," *Regents of Univ. of Calif. v. Doe*,

---

[7]State sovereign immunity is sometimes called "Eleventh Amendment" immunity because that amendment reaffirmed the doctrine after it was thrown into doubt; however, this immunity emanates from our overall constitutional framework rather than existing in any one amendment.  *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 97–98 (1984).

519 U.S. 425, 429 (1997), including state officials sued in their official capacities. *Maben*, 887 F.3d at 270. For this reason, Plaintiffs cannot seek damages from MDHHS, the Neonatal Biobank,[8] or any individual Defendant sued in his or her official capacity.

"The Eleventh Amendment, however, does not bar suits for damages against officers in their personal capacity under § 1983." *Maben*, 887 F.3d at 270 (citing *Hafer v. Melo*, 502 U.S. 21, 25–27 (1991)). Thus, Plaintiffs' claims seeking damages against Nick Lyon, Dr. Sandip Shah, Dr. Sarah Lyon-Callo, Mary Kleyn, and Dr. Antonio Yancey are not barred by Eleventh Amendment immunity.

These claims were nevertheless properly dismissed because the individual defendants are entitled to qualified immunity. To overcome qualified immunity, Plaintiffs must show that "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Plaintiffs have failed to make the required showing to overcome qualified immunity.

Plaintiffs concede that "[t]his is a case of first impression" involving "a novel circumstance alleged to be occurring in violation of the Fourth and Fourteenth Amendments." (Appellants' Br. ix.) Plaintiffs are correct that the Supreme Court has held that "a competent

---

[8]Plaintiffs' Complaint assert that Michigan Neonatal Biobank and its Director, Dr. Antonio Yancey, are both state actors suable under § 1983. The Neonatal Biobank defines itself as a "nonprofit corporation that receives all or nearly all of its funding from the State of Michigan," and the state relies on the Neonatal Biobank to "indefinitely store the Infants' blood" after the blood samples are screened for diseases. (Appellee Biobank Br. 3, 4.) The Neonatal Biobank's brief never directly addresses whether it is an arm of the state and thus seems to concede that it is. At oral argument, counsel for the Neonatal Biobank explained that the Neonatal Biobank was created by the state but stated that he did not believe any state employees or officers were on its board of directors. (Mar. 13, 2018, Oral Arg. 28:52–29:35.) We have held that an entity created by the state law "to carry out state functions" is sufficiently affiliated with the state as to constitute an arm of the state. *Estate of Ritter v. Univ. of Michigan*, 851 F.2d 846, 850 (6th Cir. 1988). The Supreme Court has noted that "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Michigan created the Neonatal Biobank to carry out the state function of storing the Infants' blood, which the state funds the Neonatal Biobank to do. The fact that the state funds the Neonatal Biobank suggests that the state's purse would be vulnerable if Plaintiffs were to recover against the Neonatal Biobank. Based on these considerations, the Neonatal Biobank is an arm of the state.

person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 277 (1990).  However, the Court has never so held for incompetent persons or minors, and it has in fact strongly suggested that this right *does not* extend to minor children.  *Id.* at 279 (noting that in a prior decision the Court "certainly did not intimate that . . . a minor child, after commitment, would have a liberty interest in refusing treatment").  Plaintiffs have therefore failed to show that "the right at issue was clearly established at the time of [Defendants'] alleged misconduct."  *Barker*, 649 F.3d at 433.

Thus, each of Plaintiffs' damages claims asserting a violation of the children's substantive due process rights when their blood was collected and screened for diseases is barred by either state sovereign immunity or qualified immunity.  Because these claims cannot be maintained against Defendants in light of the relevant immunities, we may affirm the district court without deciding whether the children's substantive due process rights were actually violated.  *See Pearson v. Callahan*, 555 U.S. 223, 237 (2009).  Nevertheless, under *Pearson v. Callahan*, we may still "exercise [our] sound discretion" to decide whether a constitutional violation occurred.  555 U.S. at 236.[9]

In this instance, we will exercise our discretion to decide the underlying constitutional question because this is an issue for which "a discussion of why the relevant facts do not violate clearly established law make[s] it apparent that in fact the relevant facts do not make out a constitutional violation at all."  *Id.*  The qualified immunity discussion above makes it apparent that the children's substantive due process rights were not violated.  As mentioned, the Supreme Court has strongly suggested that minor children lack a liberty interest in directing their own medical care.  *Cruzan*, 497 U.S. at 279; *see also Schall v. Martin*, 467 U.S. 253, 265 (1984) ("Children, by definition, are not assumed to have the capacity to take care of themselves.").

---

[9]Defendants argue that we should not address Plaintiffs' substantive due process claims because Plaintiffs also raise Fourth Amendment claims arising out of the drawing of the children's blood.  Defendants cite the Supreme Court's statement that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver,* 510 U.S. 266, 273 (1994)).  However, *Lewis* is distinguishable because it concerned the vaguer "shocks the conscience" test of substantive due process, rather than a claim relating to a specific fundamental right like the right to direct one's medical care.  Because the substantive due process rights that Plaintiffs assert are analytically distinct from their Fourth Amendment claims, we may address both types of claims separately.

Instead, children must instead rely on parents or legal guardians to do so until they reach the age of competency. *See Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions."); *Schall*, 467 U.S. at 265 (recognizing that children "are assumed to be subject to the control of their parents."). Accordingly, any substantive due process rights related to directing the medical care of children devolve upon the parents or legal guardians of the children, rather than the children themselves. The children's substantive due process rights were therefore not violated when Defendants drew their blood and screened it for diseases, providing another basis upon which to affirm the district court's dismissal of these claims.

## 2.   Alleged Violation of the Parents' Substantive Due Process Rights When Blood Samples Were Collected

Plaintiffs seek damages based on Defendants' alleged violation of the parents' substantive due process rights when their children's blood samples were collected and screened for diseases. As with the previous claim, this claim is for damages and thus can only be brought against the state officers in their individual capacities due to state sovereign immunity. And as with the previous claim, the state officers are entitled to qualified immunity.

To overcome qualified immunity, Plaintiffs must show that "the right at issue was clearly established at the time of the defendant's alleged misconduct." *Barker*, 649 F.3d at 433. Plaintiffs acknowledge that "there is little case law on the same factual circumstances of this case." (Appellants' Br. 25.) Plaintiffs further concede that "Supreme Court precedent . . . has not delineated the parameters of a 'parent's right to parent' in a way that can be neatly applied to new sets of facts." (Appellants' Br. 24 (quoting R. 50, Order, ID# 831 (citing *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003)))).) Nevertheless, Plaintiffs argue that "nonconsensual medical treatment and testing violating the Fourteenth Amendment is not a completely first impression matter in this country." (Appellants' Br. 20.)

It is true that the Supreme Court has recognized parents' substantive due process right to "direct the upbringing and education of children under their control." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925). However, this precedent does not address the issue of parents'

right to control their children's medical care and therefore does not demonstrate that Defendants violated Plaintiffs' clearly established rights. *See Reichle*, 566 U.S. at 664. The case law in this area is sparse; Plaintiffs cite only a Tenth Circuit case and a district court case touching on the issue of parents' right to control their children's medical care. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003); *Beleno v. Lakey*, 306 F. Supp. 3d 930 (W.D. Tex. 2009). In *Dubbs*, the Tenth Circuit held that the district court had erroneously applied the "shocks the conscience" standard to a claim similar to the instant claim, but "decline[d] to resolve the difficult questions regarding the standard to be applied." 336 F.3d at 1203–04. Plaintiffs are therefore incorrect that even one court of appeals case has squarely addressed the question before us. And even if it were, "[t]his court has stated that out-of-circuit precedent clearly establishes rights only in 'extraordinary case[s]'" involving rights that are "clearly foreshadowed by applicable direct authority," which is not true of the rights at issue in this case. *Hearring v. Sliwowski*, 712 F.3d 275, 282 (6th Cir. 2013) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)).

State sovereign immunity and qualified immunity therefore bar all of Plaintiffs' claims alleging that the parents' substantive due process rights were violated when Defendants drew their children's blood and screened it for diseases, and we decline to exercise our discretion to reach the merits of this issue. *See Pearson*, 555 U.S. at 236. In contrast with the issue discussed in the previous section, we cannot easily say, based on the allegations in the Complaint, that the drawing of the children's blood "do[es] not make out a constitutional violation" of the parents' substantive due process right to direct their children's medical care. *Id.* The Supreme Court has suggested that we might decline to exercise our jurisdiction in situations where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson*, 555 U.S. at 237. Because this issue presents such a situation, we decline to rule on whether the initial drawing of blood violated the parents' substantive due process rights, and we affirm the district court's judgment solely on qualified immunity and state sovereign immunity grounds.[10]

---

[10]We note as well that although these Plaintiffs lack standing to pursue prospective relief on their claims arising out of the initial drawing of blood, future plaintiffs may be able to demonstrate a risk of future harm that is

### 3. Alleged Violation of the Children's Substantive Due Process Rights Based on Ongoing Storage of Blood Samples

Plaintiffs seek damages, as well as injunctive and declaratory relief, based on the alleged violation of the children's substantive due process right to direct their own medical care by Defendants' retention of the children's blood samples after the samples have been screened for diseases, by Defendants' transfer of the samples to the Neonatal Biobank, and by Defendants' ongoing storage of the samples for further use by the state. As with the previous claims, state sovereign immunity and qualified immunity prevent Plaintiffs from obtaining damages against Defendants in connection with this claim.

Unlike with the previous claims, however, Plaintiffs have standing to seek prospective relief for the alleged ongoing violation of the children's rights. State sovereign immunity prevents Plaintiffs from seeking such relief against MDHHS and the Neonatal Biobank because these entities are state instrumentalities that are considered "the state and its departments." *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993) (citing *Pennhurst*, 465 U.S. at 100–01). But state sovereign immunity is subject to a few exceptions, one of which is the doctrine first announced in *Ex parte Young*, 209 U.S. 123 (1908). "[T]he Supreme Court announced an exception to Eleventh Amendment sovereign immunity in *Ex parte Young* for claims [under federal law] for injunctive relief against individual state officials in their official capacities." *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). We have further explained:

> Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law, *Will* [*v. Mich. Dept. of State Police*, 491 U.S. 58,] 71 & n. 10 [(1989)], regardless of whether compliance might have an ancillary effect on the state treasury, *Edelman* [*v. Jordan*, 415 U.S. 651,] 667–68 [(1974)]; *Doe v. Wigginton*,

---

"concrete, particularized, and actual or imminent" enough to give them standing to pursue such relief. *Shearson*, 725 F.3d at 592 (quoting *Clapper*, 568 U.S. at 409). Such plaintiffs would only need to demonstrate a "substantial risk" that the harm will occur. *Clapper*, 568 U.S. at 414 n.5 (quoting *Monsanto Co.*, 561 U.S. at 153). For example, future plaintiffs might consist of individuals who are pregnant or seeking to become pregnant. If these potential plaintiffs can demonstrate more than mere "'some day' intentions" to bear children, they will likely have standing to pursue prospective relief relating to the risk that their future children's blood will be drawn at birth. *Lujan*. 504 U.S. at 564. The possibility of such a case, which would *require* us to address the merits of this issue, further supports our decision not to exercise our discretion to decide the issue in this case, where such decision would seem to be "an essentially academic exercise." *Pearson*, 555 U.S. at 237.

21 F.3d 733, 737 (6th Cir. 1994). "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young,* 209 U.S. at 160–62, 28 S.Ct. 441). The *Ex parte Young* exception does not, however, extend to any retroactive relief. *Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

*S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008).[11]

In this case, the *Ex parte Young* exception applies only to the individual state officers—Nick Lyon, Dr. Sandip Shah, Dr. Sarah Lyon-Callo, Mary Kleyn, and Dr. Antonio Yancey—and only to the extent that Plaintiffs' claims are brought against these individuals in their official capacities. The *Ex parte Young* exception does not permit Plaintiffs to seek damages or any other retroactive relief against these Defendants, but it does permit Plaintiffs to seek prospective injunctive and declaratory relief against them. In sum, Plaintiffs' claims fit within the *Ex parte Young* exception to the extent that they relate to the ongoing storage of the children's blood (which Plaintiffs allege is a "continuing violation of" the children's substantive due process rights) and they seek prospective relief aimed at stopping this alleged violation.

Thus, state sovereign immunity does not bar Plaintiffs' claims for prospective relief against the individual Defendants in their official capacities arising out of the ongoing storage of the children's blood. Nor are Plaintiffs' claims seeking prospective relief against these Defendants barred by qualified immunity, as "qualified immunity only immunizes defendants from monetary damages"—not injunctive or declaratory relief. *Williams v. Com. of Ky.*, 24 F.3d 1526, 1541 (6th Cir. 1994). We can therefore proceed to the merits of Plaintiffs' claim that Defendants' retention and ongoing storage of their blood samples violates the children's substantive due process rights.

---

[11]Another reason that claims against the state and its agencies cannot be maintained under § 1983 is that these entities are not suable "persons" for purposes of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64–66 (1989). By contrast, "a state official in his or her official capacity, when sued for injunctive relief, [is] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10 (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n.14 (1989) and citing *Ex parte Young*, 209 U.S. at 159–60). The Supreme Court has explained that "[t]his distinction is 'commonplace in sovereign immunity doctrine,' L. Tribe, American Constitutional Law § 3–27, p. 190, n. 3 (2d ed. 1988), and would not have been foreign to the 19th-century Congress that enacted § 1983." *Id.*

This claim fails because the children's substantive due process rights were not violated. As discussed above, children cannot control their own medical care and must instead rely on parents or legal guardians to do so until they reach the age of competency. *See Cruzan*, 497 U.S. at 279; *Schall*, 467 U.S. at 265; *Parham*, 442 U.S. at 602. Therefore, any substantive due process rights related to their care devolve upon the parents or legal guardians rather than the children themselves. For this reason, we affirm the district court's dismissal of the children's substantive due process claims. The rights of the parents or guardians are discussed in the following section.

### 4. Alleged Violation of the Parent's Substantive Due Process Rights Based on Ongoing Storage of Blood Samples

Plaintiffs seek damages, as well as injunctive and declaratory relief, based on the alleged violation of the parent's substantive due process rights to direct the medical care of their children by Defendants' retention, transfer, and ongoing storage of the children's blood samples.

For the reasons already discussed, state sovereign immunity and qualified immunity prevent Plaintiffs from obtaining damages against Defendants. Plaintiffs cannot seek prospective relief against MDHHS or the Neonatal Biobank, but they can seek such relief against the individual Defendants in their official capacities. *See Thiokol Corp.*, 987 F.2d at 381. We therefore proceed to the merits of Plaintiffs' claim that Defendants' ongoing storage of their children's blood samples violates the parents' substantive due process rights.

Parents possess a fundamental right to make decisions concerning the medical care of their children. It is well established that a parent has a substantive due process right "to direct the education and upbringing of [his] children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925)). Otherwise stated, a parent has a "fundamental right to make decisions concerning the care, custody, and control of her" children, *Troxel v. Granville*, 530 U.S. 57, 72 (2000), which would seem to naturally include the right to direct their children's medical care. *See Parham*, 442 U.S. at 604 ("[Parents] retain plenary authority to seek [at least some forms of medical] care for their children [including institutionalization], subject to a physician's independent examination and medical judgment."); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th

Cir. 2010) (recognizing that although "[t]he Supreme Court has . . . never specifically defined the scope of a parent's right to direct her child's medical care," "precedent reasonably suggests that the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care").

The right of parents to direct the medical care of their children has further support in the case law as well.   In *Cruzan*, the Supreme Court held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."  497 U.S. at 278.  As discussed, children do not possess the right to make medical decisions for themselves because "[c]hildren, by definition, are not assumed to have the capacity to take care of themselves." *Schall v. Martin*, 467 U.S. 253, 265 (1984).  However, this does not imply that *no one* has a fundamental right to direct the medical care of children.  Rather, "[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602.  Children "are assumed to be subject to the control of their parents." *Schall*, 467 U.S. at 265.  Thus, it is logically the parents who possess a fundamental right to direct the medical care of their children.  For these reasons, parents' substantive due process right "to make decisions concerning the care, custody, and control" of their children includes the right to direct their children's medical care.  530 U.S. at 72.

The existence of a fundamental right means that "[g]overnment actions that burden the exercise of [the right] are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Seal v. Morgan*, 229 F.3d 567, 574–75 (6th Cir. 2000).  This does not mean that parents' control over their children is without limit. *See Schall*, 467 U.S. at 265 ("[I]f parental control falters, the State must play its part as parens patriae [and in such circumstances] the juvenile's liberty interest may . . . be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the child.'" (quoting *Santosky v. Kramer*, 455 U.S. 745, 766 (1982))).   Indeed, limitations on parents' control over their children are particularly salient in the context of medical treatment. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905) (holding that a compulsory vaccination law with only medical exemptions did not violate any federal constitutional right); *Nikolao v. Lyon*, 875 F.3d

310, 316 (6th Cir. 2017) (holding that a compulsory vaccination law with some religious exemptions did not violate the First Amendment).**12**  The state's interest in preserving the welfare of children is at its zenith when the life of the child is at stake, and in such circumstances the state in its role of *parens patriae* may subordinate the interest of the child's parents to its own interest in keeping the child alive.  *See Schall*, 467 U.S. at 265.  A program to screen children for life-threatening diseases at birth may be an example of a state's proper exercise of its *parens-patriae* role, provided that the state operates the program for purely benevolent motives.  *See Jacobson*, 197 U.S. at 38; *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944) ("[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare . . . .").  It may well be that the NSP would survive strict scrutiny to the extent that it involves drawing the children's blood and screening for life-threatening diseases.  However, as stated, we decline to rule on this aspect of the NSP because Plaintiffs' substantive due process claims relating to the initial drawing of blood and screening for diseases are barred by state sovereign immunity and qualified immunity.

The only remaining question is whether Defendants' subsequent retention, transfer, and storage of the samples violate the parents' fundamental rights.  Plaintiffs allege facts sufficient to state plausible claims for relief on this issue, and we therefore reverse the district court's dismissal of these claims.

Plaintiffs allege that after screening children's blood samples for diseases, Defendants retain the samples, transfer the samples to the Neonatal Biobank, and store the samples indefinitely for further use by the state or third parties.  Plaintiffs allege that these actions are

---

**12**Plaintiffs argue that these cases only stand for the proposition that "[l]aws that are intended to prevent a person from harming others by disease contagion can be justified as an exercise of police power" and that the cases do not govern in this instance because none of the diseases screened for in the program at issue are contagious. (Appellants' Br. 28–29.)  This argument ignores much precedent to the effect that the state may protect children from danger created by their parents.  *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1994) ("Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control . . . in many [] ways.").  Plaintiffs' argument is essentially that a parent may not place other parents' children in danger via her decisions as to her child's medical care, *see Jacobson*, 197 U.S. at 38, but that a parent can put her own child in danger via such decisions.  Such a holding would be deeply unsettling; fortunately, neither the Constitution nor any cases interpreting the Constitution persuade us that it is correct.

undertaken without informed parental consent.[13]  Because this case is before us on appeal from a motion to dismiss, we must take Plaintiffs' factual allegations as true. *Iqbal,* 556 U.S. at 678. Taking these allegations as true, Defendants' actions constitute a denial of the parents' fundamental right to direct the medical care of their children, and their actions must survive strict scrutiny.

On remand, Defendants will be free to produce evidence demonstrating that the parents consented to some or all of Defendants' actions vis-à-vis the children's blood samples.  To the extent that the parents provided informed consent to Defendants' actions, no fundamental liberty interest would have been impinged because the parents would not have been denied the right to control their children's medical care, although it may be that merely "present[ing] [parents] with an option to opt out of having their child's blood used for research" as the district court seemed to believe occurred here, (R. 50, Order Granting Motions to Dismiss, Page ID# 838), is not sufficient if the default is for the state to use the samples for research.  We note that consent to allow the state to conduct research on the children's blood samples does not necessarily imply consent to allow the state to sell the blood samples to third parties.  Many questions about the nature and scope of parental consent remain, and the case should proceed to discovery so that the parties may produce evidence relating to these questions.

On remand, the parties will also be able to produce evidence relating to whether Defendants had a compelling interest in retaining, transferring, and storing the children's blood samples after screening them for diseases, and whether Defendants' means for achieving their interest were narrowly tailored.  Based on Plaintiffs' allegations, it seems unlikely that Defendants will be able to demonstrate a compelling interest, as the health of the child is no

---

[13]The Complaint alleges that Plaintiffs did not give informed consent at all.  Plaintiffs also allege that any consent the parents purported to give was not general enough to permit all of Defendants' actions with respect to the samples.  The district court seemed to suggest that the parents' claims failed because they consented to the use of their children's samples for research.  (R. 50, Order Granting Motions to Dismiss, Page ID# 838.)  To be clear, Plaintiffs do not concede that they consented to the state's retention, transfer, storage, or use of their children's blood samples.  To the extent the district court held that Plaintiffs made such a concession, it erred in refusing to "accept[] [Plaintiffs' factual allegations] as true," as the posture of the case requires. *Iqbal,* 556 U.S. at 678.  We emphasize that a fundamental right is at stake; it will be essential on remand to determine the precise nature and scope of any parental consent that occurred.  Based on the facts alleged, Plaintiffs did not consent to all of Defendants' actions with respect to the samples.

longer at stake after the samples have been tested for life-threatening diseases.[14] Plaintiffs allege that Defendants conduct research on children's stored blood samples and seek to derive profit from the children's samples by selling them to third parties. On remand, Defendants may deny that they have a present or future commercial interest in the blood samples (which, up to this point in the litigation, they have not done) and may present evidence demonstrating other purposes for retaining, transferring, and storing the samples.

We therefore reverse the district court's dismissal of these claims and remand for further proceedings consistent with this opinion.

**Summary**

Because MDHHS, the Neonatal Biobank, and every individual Defendant sued in his or her official capacity are entitled to state sovereign immunity, dismissal with respect to Plaintiffs' substantive due process claims seeking damages from them was proper. The district court also properly dismissed Plaintiffs' claims seeking damages against every individual Defendant in his or her individual capacity because they were entitled to qualified immunity. The district court properly dismissed Plaintiffs' claims relating to the substantive due process rights of the children because these claims fail on their merits. However, the district court erred in dismissing Plaintiffs' claims seeking prospective relief against the individual Defendants in their official capacities relating to their alleged violation of the parents' substantive due process rights in connection with Defendants' retention and ongoing storage of the blood samples, because these claims are not subject to qualified immunity and fall within the *Ex parte Young* exception to state sovereign immunity. The parents have a fundamental right to direct the medical care of their children, and their claims may go forward so that the parties can present evidence related to Defendants' actions and the legal implications of those actions. Specifically, the questions on remand will be whether the evidence demonstrates that Defendants' actions interfered with the

---

[14]Plaintiffs concede that the state may have policies requiring parents to be notified but allege that these policies are not always followed. The parties will have the opportunity on remand to introduce evidence as to these policies and the extent to which Defendants followed them, and we wish to emphasize the importance of notifying parents as to any medical procedures that may have been conducted on their children and the importance of uniformity and consistency in how parents are notified. *See Doe v. Heck*, 327 F.3d 492, 524 (7th Cir. 2003) (holding the state denied parents' substantive due process rights by conducting a custodial interview of a child "without notifying or obtaining the consent of his parents").

parents' right to direct their children's medical care; and, to the extent they did interfere with the parents' fundamental rights, whether those actions survive strict scrutiny.

Thus, we affirm the district court's dismissal of all of Plaintiffs' substantive due process claims except their claims against the individual Defendants in their official capacities to the extent that those claims seek injunctive and declaratory relief in connection with the alleged violation of the parent's substantive due process right by Defendants' retention and ongoing storage of the blood samples. With respect to those latter claims, we reverse and remand the case for further proceedings consistent with this opinion.

## III.   Fourth Amendment Claims

### Standard of Review

"We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Casias*, 695 F.3d at 43. To survive a motion to dismiss, a complaint "does not need detailed factual allegations," but should identify "more than labels and conclusions." *Twombly,* 550 U.S. at 555 (citations omitted). A complaint also "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### Analysis

As discussed above, Plaintiffs have standing to bring only two categories of Fourth Amendment claims: claims for damages resulting from Defendants' alleged violation of the children's Fourth Amendment rights when their blood samples were collected and screened for diseases; and claims for damages, as well as injunctive and declaratory relief, resulting from the alleged violation of the children's Fourth Amendment rights by Defendants' retention, transfer, and storage of the blood samples. We will address these claims in turn.

#### 1.   Alleged Violation of the Children's Fourth Amendment Rights When Blood Samples Were Collected

Plaintiffs seek damages based on the alleged violation of the children's Fourth Amendment rights when their blood samples were collected and screened for diseases, arguing

that Defendants' actions constituted a search for which a warrant was required. These damages claims suffer the same defects as all of the other damages claims already discussed. Namely, state sovereign immunity bars damages actions against all Defendants except the individual Defendants sued in their individual capacities, and qualified immunity bars damages actions against any of the individual Defendants sued in their individual capacities.

With respect to qualified immunity, Plaintiffs concede that "[t]his is a case of first impression" involving "a novel circumstance alleged to be occurring in violation of the Fourth and Fourteenth Amendments." (Appellants' Br. ix.) Even assuming that the children's Fourth Amendment rights were violated by the initial drawing of their blood, these rights were not clearly established. On their face, these claims might appear to present a closer call than the previous claims, in that the Supreme Court has held that drawing blood does constitute a Fourth Amendment violation in some circumstances. *Schmerber v. California*, 384 U.S. 757, 767–68 (1966) (holding that when a police officer directs that a suspect's blood be drawn in order to produce evidence in connection with a criminal investigation, the drawing of blood "plainly constitute[s] [a] search[] of [a] 'person[],'" and is therefore subject to "respected relevant Fourth Amendment standards of reasonableness"). However, this does not indicate a clearly established right, as this case is far from a straightforward application of *Schmerber*. After *Schmerber*, it is true that any reasonable medical professional knows or should know that such professionals cannot draw blood for law enforcement purposes without a medical reason or the patient's consent, unless they obtain a search warrant. But Defendants claim that their motivation for drawing the children's blood—or at least part of their motivation—is to provide the children with medical care.

Because our case law does not clearly establish in what circumstances the Fourth Amendment bars a medical professional from drawing a child's blood for medical purposes without parental notification or consent—or whether such medical purposes must be the primary or predominant motivation for the drawing of blood—the individual Defendants in this case are entitled to qualified immunity. In *Schmerber*, the defendant's blood was drawn at the direction of a police officer seeking evidence that the defendant had driven while intoxicated. 384 U.S. at 758–59. By contrast, Plaintiffs have never alleged that the state had an evidence-gathering

motive for the drawing of blood in this case.  We have noted that there remains a substantial question as to whether drawing blood for the purpose of screening for diseases constitutes a search or seizure for Fourth Amendment purposes.  *See Hearring v. Sliwowski*, 712 F.3d 275, 281 (6th Cir. 2013) ("This court has not taken a definitive position on whether the Fourth Amendment's protection against unreasonable searches applies to the provision of medical services by government-employed health-care professionals.").  In *Hearring*, we held that a defendant nurse was entitled to qualified immunity because "existing precedents did not give [her] fair warning that her medical assessments were subject to the Fourth Amendment's reasonableness requirement, and accordingly the right at issue was not clearly established."  *Id.* at 282–83.  We did not reach the merits of the plaintiff's claim in *Hearring*, nor have we settled this issue in any decision after *Hearring*.  *Id.*  Thus, Defendants are entitled to qualified immunity because Plaintiffs have failed to show that "the right at issue was clearly established at the time of [their] alleged misconduct."  *Barker*, 649 F.3d at 433.

State sovereign immunity and qualified immunity therefore bar all of Plaintiffs' claims alleging that the children's Fourth Amendment rights were violated when Defendants drew their blood and screened it for diseases, and we decline to exercise our discretion to decide whether these actions actually violated the children's Fourth Amendment rights.  *See Pearson*, 555 U.S. at 236.  As our discussion of this issue in *Hearring* demonstrates, this is a situation where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  *Pearson*, 555 U.S. at 237.  We therefore decline to rule on whether the initial drawing of blood violated the children's Fourth Amendment rights, and we affirm the district court solely on qualified immunity and state sovereign immunity grounds.[15]

### 2.  Alleged Violation of the Children's Fourth Amendment Rights Based on Ongoing Storage of Blood Samples

Plaintiffs seek damages, as well as injunctive and declaratory relief, based on the alleged violation of the children's Fourth Amendment rights by Defendants' retention of the blood

---

[15]We note again the possibility that future plaintiffs may have standing to seek prospective relief relating to the risk that their future children's blood will be drawn at birth.  *See supra*, footnote 10.  This possibility further supports our decision not to exercise our discretion to decide the issue in this case, where such decision would seem to be "an essentially academic exercise."  *Pearson*, 555 U.S. at 237.

samples after the samples have been screened for diseases, by Defendants' transfer of the samples to the Neonatal Biobank, and by Defendants' ongoing storage of the samples for further use by the state. Due to state sovereign immunity and qualified immunity, Plaintiffs cannot recover damages against Defendants. Due to state sovereign immunity, Plaintiffs cannot seek injunctive or declaratory relief against MDHHS or the Neonatal Biobank. *See Thiokol Corp.*, 987 F.2d at 381. But Plaintiffs can seek such prospective relief against the individual Defendants in their official capacities. *See id.*

We therefore proceed to the merits of Plaintiffs' claims that Defendants' ongoing storage of their children's blood samples violates the children's Fourth Amendment rights. The district court dismissed these ongoing seizure claims for lack of standing. For the reasons discussed above, this was error. In fact, Plaintiffs have stated plausible claims that the ongoing retention and storage of the children's blood samples for further use by the state violates the children's Fourth Amendment rights. Accordingly, the district court erred in dismissing these claims, and we reverse and remand.

First, we note that this claim is analytically distinct from the question raised in the previous section of whether drawing the children's blood and screening it for diseases violated the children's Fourth Amendment rights—a question that we decline to address in this opinion and will not be before the district court on remand. It is not necessary to decide whether the drawing of blood was an unconstitutional search or seizure in order to decide whether the retention, storage, or use of the blood samples violate the children's Fourth Amendment rights. This is because Defendants' ongoing storage and potential future use of the blood samples might be unconstitutional regardless of whether Defendants' completed actions of drawing and screening the children's blood for disease were constitutional. If drawing and screening the blood was unconstitutional, it is still possible that the ongoing retention, storage, or use of the sample constitutes a separate, independent violation. *See Skinner*, 489 U.S. at 616 (noting that after an unconstitutional blood draw occurs, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a *further* invasion of the tested employee's privacy interests" (emphasis added)). And if drawing and screening the blood was constitutional, it may still have become an illegal seizure if Plaintiffs suffered a further, unlawful, deprivation of their interests at

some later point. *See, e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 124–25 (1984) (holding that a legal seizure of a package became illegal when officers conducted a field test on it because the test "affect[ed] respondents' possessory interests . . . by destroying a quantity of the powder [thereby] convert[ing] what had been only a temporary deprivation of possessory interests into a permanent one").

It is apparent in the case law that the duration of a seizure affects its constitutionality. For example, the Supreme Court has long recognized that what begins as a lawful seizure can become unlawful if it continues for an unreasonable amount of time. *See United States v. Place*, 462 U.S. 696, 707–09 (1983) ("[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is [constitutional]."). This Court has similarly recognized that extended seizures pose unique constitutional problems. *See United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) ("[W]hile a *Terry* stop may be constitutionally permissible initially, it may become an impermissible 'seizure if it occurs over an unreasonable period of time or under unreasonable circumstances.'" (quoting *United States v. Orsolini*, 300 F.3d 724, 729–30 (6th Cir. 2002)); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 546 (6th Cir. 2002) (holding that an officer possessed reasonable suspicion that "would [have] permit[ted] [him] to detain the [plaintiffs'] green cards . . . until the following day," but that a "four-day detention of the[ir] green cards . . . was unreasonable in duration").

To evaluate the constitutionality of a seizure's duration, it is necessary to consider whether the duration is "reasonably needed to effectuate those purposes [justifying the seizure]." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). It does not seem that the health of the child justifies the state in taking any actions with respect to the blood samples after it has finished screening the samples for diseases. As discussed, Plaintiffs allege that Defendants conduct research on children's stored blood samples and seek to derive profit from the children's samples by selling them to third parties. If this is indeed Defendants' purpose in retaining the children's blood samples, then their ongoing, indefinite seizure of the samples is unreasonable. For this reason, Plaintiffs have plausibly stated a claim upon which relief can be granted, and the district court erred in dismissing their Fourth Amendment claims relating to the ongoing storage and

potential future use of the blood samples. The case should proceed to discovery so that the parties may produce evidence of the state's purposes for retaining, storing, and using the children's blood samples after they have been screened for diseases.

On remand, whether Plaintiffs consented to any aspect of Defendants' retention, storage, or future use of the blood samples will also affect whether there is an ongoing seizure in violation of the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is [] well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").

## Summary

Because MDHHS, the Neonatal Biobank, and every individual Defendant sued in his or her official capacity are entitled to state sovereign immunity, dismissal with respect to Plaintiffs' Fourth Amendment claims seeking damages from them was proper. The district court also properly dismissed Plaintiffs' claims seeking damages against every individual Defendant in his or her individual capacity because they were entitled to qualified immunity. However, the district court erred in dismissing Plaintiffs' claims seeking prospective relief against the individual Defendants in their official capacities relating to their alleged violation of the children's Fourth Amendment rights in connection with the ongoing storage, use, or transfer of the blood samples, because Plaintiffs have standing to bring these claims and they are not subject to qualified immunity or state sovereign immunity. Plaintiffs have stated a plausible claim that Defendants' actions violated their Fourth Amendment rights.

Thus, we affirm the district court's dismissal of all of Plaintiffs' Fourth Amendment claims except their claims against the individual Defendants in their official capacities to the extent that those claims seek injunctive and declaratory relief in connection with Defendants' ongoing retention, transfer, and storage of the blood samples. With respect to those latter claims, we reverse and remand the case for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons set forth above, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

———————————

## CONCURRENCE

———————————

ROGERS, Circuit Judge, concurring.  I concur in full.  However, with respect to the plaintiffs' standing for their damages claims, I would frame the analysis a little differently.  In any event, none of the damage suits may proceed anyway because of sovereign or qualified immunity, as the majority opinion explains.

Most Article III standing analysis deals with whether a plaintiff has standing to seek injunctive or declaratory relief.  If a plaintiff sues to stop government illegality, the allegedly illegal government action must adversely affect the plaintiff, not someone else or the public at large.  Otherwise, the federal courts would serve as a council of review for the constitutionality and legality of government actions.  It is the power to resolve cases or controversies—and only that power—that gives the courts the power under *Marbury v. Madison* to review the constitutionality and legality of government actions.

Damage suits are almost always cases or controversies because the relief sought, if granted, will inherently help the plaintiff.  In contrast, a suit for injunctive relief against a government official is not a case or controversy if the injunctive relief sought does not benefit the plaintiff in particular.  That is the thrust of cases like *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  In contrast, a plaintiff who wins a damages suit will inherently get relief that inures specially to the plaintiff.  Thus a damages suit generally constitutes a case or controversy, even if the suit is frivolous, and even if the underlying cause of action (negligence, for instance) turns out to fail for lack of causation or injury.  There is standing because *if* the plaintiff gets the relief sought, in the form of an award of court-ordered money damages to the plaintiff, the relief would benefit the plaintiff in particular.

Thus a money damages suit is generally an Article III case or controversy.  The only exception is when Congress seeks unduly to circumvent the very separation-of-powers principle inherent in the case-or-controversy requirement itself.  Congress might try to do so by creating a damages cause of action for the violation of a right that is merely a right to have the government

obey some law, regardless of whom that law benefits.  A statute creating such a "bounty" for getting the government to obey the law unconstitutionally circumvents the separation-of-powers principle described above.  "[A]n interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes."  *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000).  In *Vermont Agency*, the Court provided the example of *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), where the Court explained that "a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit."  *Id.* at 107.  *Spokeo* is best understood in this light. *See Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540 (2016).

The damages claims in this case are cases or controversies because the plaintiffs, if successful, would be awarded compensation.  Further, this is not a case where Congress has sought to circumvent Article III through something like a "bounty" for bringing suit to protect other people or the public at large.  That is enough to conclude that the damages claims in this case meet the Article III standing requirement.